No. 15-1329, -1388

# United States Court Of Appeals for the Federal Circuit

POWER INTEGRATIONS, INC.,

*Plaintiff/Cross-Appellant,*

v.

FAIRCHILD SEMICONDUCTOR INTERNATIONAL, INC.,
FAIRCHILD SEMICONDUCTOR CORPORATION,
FAIRCHILD (TAIWAN) CORPORATION

*Defendants-Appellants,*

APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE
CHIEF JUDGE LEONARD P. STARK, CASE NO. 08-CV-00309-LPS

## POWER INTEGRATIONS' NON-CONFIDENTIAL OPENING BRIEF

Frank E. Scherkenbach
Fish & Richardson P.C.
One Marina Park Drive
Boston, MA 02110-1876
(617) 542-5070

Howard G. Pollack
Michael R. Headley
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
(650) 839-5070

Craig E. Countryman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

October 2, 2015

### CERTIFICATE OF INTEREST

Counsel for Cross-Appellant Power Integrations, Inc. certifies the following:

1.      The full name of every party represented by me is:  Power Integrations, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  N/A.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:  N/A.

4.      The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this court are:

> Fish & Richardson P.C.:  Frank E. Scherkenbach, Howard G. Pollack, Michael R. Headley, Craig E. Countryman, Neil Warren, William J. Marsden, Joseph B. Warden, Keeley I. Vega*, Kyle Wagner Compton*, Scott A. Penner*.
>
> *No longer with firm

Dated:  October 2, 2015                    /s/ Craig E. Countryman
                                           Craig E. Countryman

i

# <u>**TABLE OF CONTENTS**</u>

<u>**Page**</u>

Certificate of Interest ................................................................... i

Statement of Related Cases ........................................................ x

Statement of Jurisdiction .......................................................... xi

Statement of Power Integrations' Issues .................................. xii

Statement of Fairchild's Issues ................................................ xiii

Statement of the Case ................................................................. 1

Statement of the Facts ................................................................ 3

I.     The Marketplace:  Fairchild Steals Business for U.S.-Bound Controller Chips Using Power Integrations' Patented Technology. ............................................... 3

     A.     Power Integrations' Patented Technology Led to Smaller, Lighter, More Energy Efficient Power Supplies. ...................................................... 3

     B.     Fairchild Exploits Power Integrations' Patented Technology to Steal Sales and Erode Prices. ........... 5

     C.     Fairchild Targets the U.S. Market To Maximize Its Sales of Infringing Chips. ........................................... 6

II.     The Patents-in-Suit:  Power Integrations' Patents Cover Fundamental Technology, While Fairchild's is a Narrow Implementation of Prior Art. ............................................... 13

     A.     Power Integrations' '876 Patent:  Frequency Jitter to Reduce Interference Without a Bulky Memory. 13

     B.     Power Integrations' '605 patent:  Constant Current and Power Output Using a Variable Current Limit. ......................................................... 17

C.    Fairchild's '972 patent:  Combining Jitter With Primary Side Control Using Two Distinct Feedback Signals. ...................................... 19

Summary of the Argument ...................................................... 23

Argument ............................................................................. 25

I.    The Judgment on the '972 Patent Should Be Reversed or Vacated. ............................................................... 25

A.    Cross-Appeal:  The District Court's Claim Construction Erroneously Ignored the Claims' Plain Meaning. ......................................... 25

B.    Cross-Appeal:  There Can Be No Infringement By Equivalents Because Fairchild's Theory Reads Out a Claim Element. ................................ 28

C.    Cross-Appeal:  The Claims Were Obvious Based on the Prior Art. ........................................ 30

D.    Fairchild's Motion for JMOL of Inducement Was Properly Denied. ........................................ 32

II.    The Jury's Inducement Finding on Power Integrations' '876 and '851 Patents Was Well-Supported in Fact and Law. ..................................................................... 34

A.    Substantial Evidence Supported the Jury's Inducement Finding. ................................... 34

B.    Fairchild's "Nexus" Argument Conflicts With Precedent and Is Unsupported by the Facts Here. 42

C.    The Jury Instructions and Verdict Form Were Proper. ....................................................... 44

III.    The Jury's Finding of No Anticipation of the '876 Patent was Supported by Substantial Evidence. ........................... 51

A.    Fairchild Ignores the "Current Source" Limitation of Claim 21 ................................................ 51

B.     The "Jitter" Limitation of Claims 1 and 21 Was Missing from the Prior Art. ...................................... 52

C.     The Prior Art Counters Were Not "Coupled to" a Digital-to-Analog Converter, as Claims 1 and 21 Require. ...................................................................... 54

IV.    The Jury's Finding of No Anticipation of the '605 Patent Was Well-Supported, But a New Trial is Necessary on Inducement. ........................................................... 56

A.     Substantial Evidence Showed that Maige Does Not Disclose a Current Limit Threshold That Increases During the On Time of the Switch ........ 56

B.     Cross-Appeal:  A New Trial on Inducement Is Necessary Because of the Erroneous No Direct Infringement Finding. ................................................ 58

V.    The District Court's Injunction Decisions Were Within Its Discretion. ......................................................... 60

A.     Power Integrations Proved the *eBay* Factors Warranted an Injunction Preventing Further Fairchild Infringement ............................................... 60

B.     The District Court Properly Denied Fairchild an Injunction Given Its Past Licensing and the Rejections in Reexamination. .................................... 66

Conclusion ................................................................. 69

Certificate Of Service And Filing ............................... 70

Certificate of Compliance ......................................... 71

## <u>CONFIDENTIAL MATERIAL OMITTED</u>

The material omitted from pages 6, 8, 36, 37, and 41 comes from the parties' internal documents and describes the identities of several customers and potential customers, the types of products at issue, and the amount of money at stake. The material omitted from pages 67-68 comes from Fairchild internal documents regarding its interactions with iWatt regarding infringement of the '972 patent. On page 67, other omitted material comes from deposition testimony from Fairchild's regarding the Infineon license.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.,*
  694 F.3d 1312 (Fed. Cir. 2012) ................................................................67

*Am. Calcar, Inc. v. Am. Honda Motor Co., Inc.,*
  651 F.3d 1318 (Fed. Cir. 2011) ................................................................30

*Apple Inc. v. Samsung Elecs. Co.,*
  735 F.3d 1352 (Fed. Cir. 2013) ......................................................... 60, 62

*Apple, Inc. v. Samsung Elecs., Co.,*
  No. 14-1802, __ F.3d __, slip op. (Fed. Cir. Sept. 17, 2015) (*Apple
  IV*) ................................................................................................... 60, 61

*In re Bill of Lading,*
  681 F.3d 1323 (Fed. Cir. 2012) ......................................................... 48, 49

*Black v. Stephens,*
  662 F.2d 181 (3d Cir. 1981) .....................................................................46

*Blyden v. Mancusi,*
  186 F.3d 252 (2d Cir. 1999) .....................................................................50

*Chef Am., Inc. v. Lamb-Weston, Inc.,*
  358 F.3d 1371 (Fed. Cir. 2004) ................................................................28

*Continental Can Co. v. Monsanto Co.,*
  948 F.2d 1264 (Fed. Cir. 1991) ................................................................52

*Douglas Dynamics, LLC v. Buyers Prods. Co.,*
  717 F.3d 1336 (Fed. Cir. 2013) ................................................................66

*Dynacore Holdings Corp. v. U.S. Philips,*
  363 F.3d 1263 (Fed. Cir. 2004) ...................................................43, 44, 49

*Fairchild Semiconductor Corp. v. Power Integrations, Inc.,*
  Case No. 12-540 LPS (D. Del.) ........................................................... x, 47

*Gasoline Prods. Co. v. Champlin Refining Co.*,
  283 U.S. 494 (1931) ....................................................................... 50

*Global-Tech Appliances, Inc. v. SEB SA*,
  131 S.Ct. 2060 (2011) .................................................................... 34

*Graves v. Johnson*,
  179 Mass. 53 (1901) ....................................................................... 39

*i4i Ltd. P'ship v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010) ................................................... 64, 65

*Kalen Co. v. Harper Brothers*,
  222 U.S. 55 (1911) ......................................................................... 39

*Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*,
  863 F.2d 867 (Fed. Cir. 1988) ....................................................... 59

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) ................................... 34, 35, 37, 49

*MEMC Elec. v. Mitsubishi Materials Silicon Corp.*,
  420 F.3d 1369 (Fed. Cir. 2005) ..................................................... 40

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005) ................................................................. *passim*

*Moleculon Research Corp. v. CBS, Inc.*,
  793 F.2d 1261 (Fed. Cir. 1986) ..................................................... 37

*Novo Indus., LP v. Micro Molds Corp.*,
  350 F.3d 1348 (Fed. Cir. 2003) ..................................................... 28

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
  778. F3d 1021, 1023 (Fed. Cir. 2015) ........................................... 25

*Pfizer, Inc. v. Apotex, Inc.*,
  480 F.3d 1348 (Fed. Cir. 2007) ..................................................... 31

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
  711 F.3d 1348 (Fed. Cir. 2013) ................................................ *passim*

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
  Nos. 11-1218, -1238 ................................................................ x, 44

*Power Integrations, Inc. v. Lee,*
    797 F.3d 1318 (Fed. Cir. 2015) .................................................................. x, 55

*Power Integrations, Inc. v. Lee,*
    No. 14-1123 ..................................................................................................... x

*Ricoh Co., Ltd. v. Quanta Comp., Inc.,*
    550 F.3d 1325 (Fed. Cir. 2008) ............................................................... 46, 47

*Robert Bosch LLC v. Pylon Corp.,*
    659 F.3d 1142 (Fed. Cir. 2011) ...................................................................... 65

*Robert Bosch, LLC v. Pylon Mfg. Co.,*
    719 F.3d 1305 (Fed. Cir. 2013) *(en banc)* ..................................................... xi

*Soverain Software LLC v. Newegg Inc.,*
    705 F.3d 1333 (Fed. Cir. 2013) ...................................................................... 32

*Standard Havens Products, Inc. v. Gencor Industries, Inc.,*
    996 F.2d 1236 (Fed. Cir. 1993) ...................................................................... 68

*SynQor, Inc. v. Artesyn Techs.,*
    709 F.3d 1365 (Fed. Cir. 2013) ...................................................................... 51

*Texas Insts., Inc. v. Cypress Semiconductor Corp.,*
    90 F.3d 1558 (Fed. Cir. 1996) ....................................................................... 30

*Thorner v. Sony Comp. Ent. Am. LLC,*
    669 F.3d 1362 (Fed. Cir. 2012) ........................................................... 25, 26, 27

*Wyers v. Master Lock. Co.,*
    616 F.3d 1231 (Fed. Cir. 2010) ...................................................................... 31

*In re Yang,*
    No. 95/002,009 ................................................................................................. x

**Statutes**

28 U.S.C. § 1292(c)(2) ............................................................................................ xi

**Other Authorities**

Fed. R. App. P. 4(a)(1) ........................................................................................... xi

Fed. R. App. P. 4(a)(3) ...................................................................................... xi

Fed. R. App. P. 54(b) ....................................................................................... xi

Fed. R. Civ. P. 51(c)(1) ....................................................................................45

## STATEMENT OF RELATED CASES

There has been no prior appeal to the Federal Circuit in this case. There were two prior appeals that are related to this one, as they all involve U.S. Patent 6,249,876.

The first was a prior appeal from a litigation involving the '876 patent in which the Court upheld a jury verdict finding certain claims were non-obvious in view of the Martin patent. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, Nos. 11-1218, -1238. It was decided by a panel of Judges Lourie, O'Malley, and Reyna, in an opinion written by Judge Reyna and published at 711 F.3d 1348 (Fed. Cir. 2013).

The second is an appeal in which this Court vacated the PTO's rejections of certain claims of the '876 patent as anticipated by the Martin, Wang, and Habetler references. *See Power Integrations, Inc. v. Lee,* No. 14-1123. It was decided by a panel of Judges Moore, Mayer, and Linn, in an opinion written by Judge Mayer and published at 797 F.3d 1318 (Fed. Cir. 2015).

There is another case involving Fairchild's U.S. Patent 7,259,972 that may be directly impacted by this appeal. *See Fairchild Semiconductor Corp. v. Power Integrations, Inc.*, Case No. 12-540 LPS (D. Del.).

Fairchild's '972 patent is also subject to a final rejection based on obviousness in an *inter partes* reexamination that is now on appeal to the Patent Trial and Appeal Board. *See In re Yang*, No. 95/002,009. One basis for the obviousness rejection is the same prior art combination at issue here—the Majid patent and Power Integrations' '876 patent.

## <u>S</u>TATEMENT OF <u>J</u>URISDICTION

The parties appeal from a Rule 54(b) judgment that was entered on January 13, 2015. (A1-3.) The judgment resolved all claims and counterclaims of infringement and invalidity, but not damages or willfulness, which were bifurcated. (A3.) It was thus a final judgment except for an accounting. *See Robert Bosch, LLC v. Pylon Mfg. Co.*, 719 F.3d 1305 (Fed. Cir. 2013) (*en banc*).

Fairchild timely filed its notice of appeal on February 10, 2015, within the 30-day deadline set by Fed. R. App. P. 4(a)(1). (A22532-53.) Power Integrations timely filed its notice of cross-appeal on February 24, 2015, within 14 days of Fairchild's appeal, as permitted by Fed. R. App. P. 4(a)(3). (A22534-36.) This Court therefore has jurisdiction over both the appeal and the cross-appeal under 28 U.S.C. § 1292(c)(2).

## STATEMENT OF POWER INTEGRATIONS' ISSUES

1.  Whether the district court erred by construing the '972 patent inconsistently with its plain meaning and interpreting the term "sampling a voltage from the auxiliary winding of the transformer **and** a discharge time of the transformer" to require sampling only a voltage.

2.  Whether Fairchild's equivalents theory on the '972 patent was legally barred because it read out an express claim limitation and was unsupported by the required "linking testimony."

3.  Whether Fairchild's '972 patent was obvious where the prior art disclosed all the claim limitations, the motivation to combine was undisputed, and Fairchild's only non-obviousness arguments were irrelevant because they related to unclaimed limitations.

4.  Whether a new trial was necessary on whether Fairchild induced infringement of Power Integrations' '605 patent where the jury's initial finding of no direct infringement was overturned on JMOL and the jury had been led astray by Fairchild's improper argument that obtaining a broader continuation patent is unfair and inappropriate.

<u>**STATEMENT OF FAIRCHILD'S ISSUES**</u>

1.      Whether substantial evidence supported the jury's finding that Fairchild induced infringement of the '876 and '851 patents where Fairchild designed its products for use in the U.S., targeted U.S. end-customers, had a financial incentive for others to import the chips into the U.S., and the accused chips have no non-infringing uses in the U.S.

2.      Whether the district court properly instructed the jury on inducement where the instruction reflected this Court's precedent on intent and Fairchild did not object to the particular language it now challenges on appeal.

3.      Whether the district court abused its discretion by providing the jury a general verdict form on inducement, rather than special interrogatories that have never been required in a prior case and are unnecessary to address any Seventh Amendment issue.

4.      Whether substantial evidence supported the jury's finding the '876 patent was not anticipated where Fairchild failed to address one limitation of claim 21 at all and the remaining disputes were a battle of the experts.

5.      Whether substantial evidence supported the jury's finding the '605 patent was not anticipated where Fairchild's prior art was materially similar to the art already considered by the PTO and Power Integrations' expert explained why it was missing the disputed limitation.

6.      If the Court affirms on the cross-appeal, whether substantial evidence supported the jury's finding that Power Integrations did not induce infringement of the '972 patent, where it had a good faith belief in non-infringement and where the accused chips could be used in the U.S. in a non-infringing manner.

7.      Whether the district court's injunction decisions were an abuse of discretion where the parties directly compete, Power Integrations has a policy against licensing, and its patented technologies drove demand, while Fairchild has freely licensed its '972 patent and all the '972 claims have been rejected in reexamination.

## STATEMENT OF THE CASE

This case follows a prior one in which Fairchild was enjoined from infringing Power Integrations' U.S. Patents 6,107,851 and 6,249,876. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348 (Fed. Cir. 2013). While that case was pending, Fairchild expanded its infringement by acquiring System General and selling additional products covered by the '851 and '876 patents. So Power Integrations pursued this suit to stop continued infringement of those patents and a new one, U.S. Patent 7,834,605. Having again been caught red-handed, Fairchild counterclaimed on U.S. Patent 7,259,972, and others since dropped, to distract from its own infringement.

The case proceeded to a liability trial, where a jury found that Fairchild again infringed the '851 and '876 patents and upheld the validity of all Power Integrations' patents. (A528-42.) The jury's direct infringement finding reflected its conclusion that Fairchild's chips necessarily infringe if imported, sold, or used in the U.S. Moreover, the jury found that Fairchild induces customers to infringe after hearing evidence that Fairchild intends customers to be able to sell products containing Fairchild's chips worldwide (including in the U.S.), designs its products so they can be used to comply with U.S. regulations, targets customers where it knows the end-products are for the U.S., indemnifies customers for U.S. patent infringement, and wants customers to sell to the U.S. so Fairchild can maximize its own sales. The jury also heard Fairchild's witnesses admit that at least some customers import and sell

Fairchild's chips and power supplies containing them in the U.S. The jury's inducement finding was thus supported by substantial evidence. Fairchild's attempts to reargue these facts on appeal should be rejected, and its legal arguments are either wrong, waived, or both. Moreover, Fairchild's validity challenges on appeal simply attempt to reargue facts and expert credibility that the jury resolved against it.

Improper argument by Fairchild, however, led the jury to find no direct infringement of the '605 patent (despite Fairchild having never disputed it) and thus no inducement. The court entered JMOL of direct infringement but denied a new trial on inducement, thinking a curative instruction had eliminated any prejudice, even though the direct infringement verdict showed otherwise. (A136-37.)

The jury found Power Integrations directly infringed the '972 patent based on an erroneous claim construction that conflicted with the claims' ordinary meaning and a legal error applying the doctrine of equivalents, but found no inducement, crediting Power Integrations' good faith belief in non-infringement. The jury also upheld the '972 patent's validity after being led astray by testimony on unclaimed limitations.

The district court enjoined Fairchild's further infringement given that Fairchild used the patented technologies to take sales, erode prices, and damage Power Integrations' reputation, but properly refused to enjoin Power Integrations given Fairchild's prior licensing of the '972 patent and the PTO's rejection of all asserted claims based, in part, on the same prior art at issue in the litigation. (A21533-37; A189-90.) These appeals followed.

<u>STATEMENT OF THE FACTS</u>

**I.    The Marketplace:  Fairchild Steals Business for U.S.-Bound Controller Chips Using Power Integrations' Patented Technology.**

**A.    Power Integrations' Patented Technology Led to Smaller, Lighter, More Energy Efficient Power Supplies.**

Power Integrations, a company based in San Jose, is a world leader in developing controller chips for power conversion.  (A24311-15.)  Power Integrations sells these chips to companies like HP, Apple, and GE, who incorporate them into products as diverse as power supplies for cellphones, computers, and printers, or products like light bulbs and refrigerators.  (A16351; A16467.)  Controller chips are the power supply's "brains" and permit it to convert high-voltage AC current from a wall outlet to low-voltage DC current usable by a consumer product.  (A16350.)

Power Integrations' three patents-in-suit cover critical technologies that integrate important features onto the controller chips themselves, and make power supplies smaller, lighter, and more energy efficient.  (A16349-50; A24312.)  The transformation has been notable—the images below show examples of the impact of using Power Integrations' technology:



DVD power supply with 70 discrete components

Equivalent power supply with POWI: 36 components

Linear transformer: weighs 12 oz.

Adapter with POWI: weighs 2 oz.

3

Power Integrations' patented technology integrated circuitry into the controller chip that solved multiple problems. For example, it significantly reduced the electromagnetic interference (EMI) generated by power supplies, interference that disrupted surrounding devices. (A16348-57.) Controller chips include an "oscillator" that controls a high-voltage power switch, which opens and closes to regulate electricity flow and generate an appropriate output. (A16350.) For efficiency reasons and to make the power supply smaller, the oscillator must be set at a relatively high frequency (meaning the switch opens and closes many thousands of times per second), but this creates unwanted signals that can interfere with the circuit's desired operation or with the operation of nearby devices. (A16354-56.) Power Integrations' '851 and '876 patents reduce interference by "jittering" the oscillator frequency around a target, thereby preventing too much interference at any particular frequency. As the '876 patent explains, this jitter circuitry "reduces the need to add extra noise filtering components" and ensures that "a compact and inexpensive power supply system can be built with minimal EMI emissions." (A233 at 4:6-10.) Customers find these benefits invaluable: Power Integrations' CEO testified the patented jitter technology has "absolutely" contributed to demand and that Power Integrations sold "dramatically more" products after incorporating it. (A16356.)

Power Integrations' U.S. Patent 7,834,605 solves another problem—it prevents a power supply from damaging an electronic device by delivering too much current. (A16368-70.) Fluctuations in the wall voltage can cause surges in a power supply's

output current. (*Id.*) Prior art circuits coped by imposing a fixed current limit, which would stop current flow by opening the switch. (A16369.) But there is a delay between when the circuit detects the current reaching the limit and when the switch actually turns off, during which time the current continues to rise and "overshoot" the limit. (*Id.*) Fixed current limits were problematic because the amount of "overshoot" varies based on the wall voltage, which is itself variable. (*Id.*) So it was hard to predict what the maximum current would be, and designers had to take extra precautions, increasing their costs. (A16370.) The '605 patent eliminated this problem with a circuit that imposes a variable current limit threshold during the time the switch is on. This was a boon for customers—they no longer had "to worry about the end product receiving too much power," and the circuit was a "much lower cost" solution than prior ones because it was fully integrated into the chip. (A16371-72; A304-05 at 2:45-50, 3:15-55.) Power Integrations' Vice President (and '605 co-inventor) testified the technology led to "significantly better" product performance, (A16375), and "certainly" contributed to the products' success. (A16377.)

### B.    Fairchild Exploits Power Integrations' Patented Technology to Steal Sales and Erode Prices.

Fairchild is Power Integrations' largest competitor and has a history of co-opting Power Integrations' technology. Fairchild was previously found to infringe the '876 and '851 patents, and this Court remarked that "Fairchild fostered a corporate culture of copying, which was not limited to the '876 Patent." *Power Integrations*, 711

F.3d at 1369.

Although Fairchild's brief downplays the importance of Power Integrations' patented technology, Fairchild has featured it prominently in its marketing materials. (A24642; A24577-78; A24729; A24566, A24573; A24586.)  In fact, the patented jitter technology is so important that Fairchild incorporated it into the names of its infringing products (*e.g.*, "SG5841J" and "SG6842J," where "j" stands for "jitter"). (A16507.)  Fairchild's witnesses also admitted that jitter is "required by customers," (A16403) and that customers, such as Apple, have required "constant power capability, regardless of the line voltage" (the '605 patented feature).  (A16501; A25011, A25014.)

The trial record contains several examples where Fairchild used the patented technology to steal business from Power Integrations and erode its prices.  (A16521-22, A24478-80 (███████████████████████); A16930, A24497 (███████████████████████████████████████████████████; A16467 (██████████████████████████████████████; A24925 (███████████████████████████); A24927 (████████████████████████████████████████████████)

### C.    Fairchild Targets the U.S. Market To Maximize Its Sales of Infringing Chips.

Fairchild has, not surprisingly, worked to capture as much business for the

Confidential Material Subject to a Protective Order Redacted on this Page

infringing products as possible.  Maximizing sales means targeting end-users

worldwide.  For example, Fairchild's Executive VP of Worldwide Sales and Marketing

admitted that "we always target to sell globally, and I'm sure some of our customers

do the same thing," because "we want to sell as many parts as we can to these

customers." (A16932.)  Other Fairchild executives told the same story:

- The Executive Vice President of Fairchild's PCIA organization, testified that Fairchild's infringing chips are "meant to go anywhere in the world," (A16772), and that "We *try* to sell our products worldwide." (A16778.)

- A former Fairchild General Manager, testified:  "[O]ur intention was always to have products for global marketplace." (A16400.)

Intending to sell products that are shipped worldwide necessarily includes the intent

to sell products destined for the U.S.  And it makes economic sense for Fairchild to

target the U.S.—the U.S. is about a third of the end-market for consumer products,

(A16467), so if Fairchild's chips weren't incorporated into U.S.-bound products, its

overall sales would diminish significantly.  Indeed, Fairchild has sought to bring

products to the U.S. market whenever possible—its former General Manager

admitted that Fairchild has taken power conversion product lines that "were not very

exposed to the U.S. market" and asked "why not take them into the U.S.

marketplace" because "that's the way to grow." (A16399.)

Fairchild encourages importation of its infringing chips into the U.S. in at least

two ways.  First, Fairchild sells to U.S. distributors that it knows resell to the U.S.

(A16932.)  Fairchild not only knows these distributors supply the U.S.—it wants them

to.  For example, the "Where to Buy" section of its website enables U.S. end-users to find a nearby U.S. distributor who can provide the product.  (A16927; https://www.fairchildsemi.com/get-help/contact-distributor/#tab-unitedstates.) Fairchild has sold every infringing part to at least one of a dozen U.S. distributors and made substantial sales to many of them.  (A16933-34; A24342-49; A24350-61; A24462-75; A24788-97.)  And, although Fairchild's brief professes indifference to whether U.S. customers buy its products, its actions tell a different story—Fairchild tracks its distributors' U.S. sales.  (A16933.)

Second, Fairchild encourages and facilitates incorporation of its infringing chips into end-products sold in the U.S.  For example, Fairchild's weekly sales reports track "opportunities" to sell Fairchild products to North America, and its Executive VP of Worldwide Sales and Marketing agreed that Fairchild "intend[s] to go out and aggressively try to sell [its] chips for those applications."  (A16928.)  One such report identifies ████████████████████████████████████████████ ████████████████████████████████," (A24495), and Fairchild admitted that it "intended to go after that sale and make that sale."  (A16929.)  That same document also showed Fairchild attempting to sell infringing chips and displace Power Integrations at a ████████████████.  (A16929-30; A24497.)  Another report identified a "new opportunity" to incorporate the infringing SG6742 chip into a "████████████████████████████████" and make $████████ per year.  (A24492.)  Fairchild's Executive VP admitted that it intended to pursue this sale

8

knowing the end-products would be imported into the United States:

> Q.    [K]nowing that this was an application for a Blu-Ray disk player in the North American market, you **intended to go after this sale**, correct?
>
> A.    **Yes**.
>
> Q.    And you **wanted to make this sale** for a product that you **knew would go to the North American market, including the United States**, correct?
>
> A.    **Yes**.

(A16931.)

Fairchild pursues these opportunities to incorporate its infringing chips into U.S.-bound products in a variety of ways. Fairchild accommodates customer requests to design the infringing chips to comply with U.S.-specific energy and environmental regulations, like those of the California Energy Commission and Energy Star, and advertises that the chips can meet them. (A16523-24; A16794; A16778; A16400, A16500-01; A24968-5010; A24931; A25065; A24908.) Fairchild also receives other customer requests for products with specifications that "will be good for sales into the United States." (A16928.) Fairchild's compliance with such U.S.-specific requests impacts demand for its products because, if Fairchild did not comply, the chips couldn't be incorporated into end-products resold in the U.S. (A16403; A25152.) Indeed, Fairchild's Executive VP admitted that it wants to give customers "products that solve their problems" because "we want to sell as much as we can." (A16773.) Fairchild recommends infringing chips to potential U.S. customers and provides demonstration boards, product datasheets, presentations, application notes, and other

design tools to instruct in their use and to promote them. (A16515-16, A25016-18, A25019-24; A25025-26; A25027-35; A25036-47; A16524; A16794; A24492; A16491; A24700-27; A24728-59.) Fairchild also has a U.S.-based technical support center—the "Americas Center of Excellence"—that supports products "appropriate for the United States market." (A16402; A24174.) We know the accused products are appropriate for U.S. markets because, as noted above, they are all sold by U.S. distributors. (A16933-34; A24342-49; A24350-61; A24462-75; A24788-97.) Moreover, Fairchild indemnifies customers for U.S. patent infringement and acknowledges Fairchild's products are incorporated into power supplies "sold in the United States." (A24341; A16787-88.)

Fairchild is well aware that its extensive efforts targeting the U.S. have succeeded. Fairchild's Executive VP of Worldwide Marketing and Sales admitted that customers have imported at least some infringing chips into the United States:

> Q. [Y]ou also know, don't you, that those customers that you sell to directly outside the United States, in fact, put your chips into parts that are then sold into the United States, don't you?
>
> A. There is a possibility of that.
>
> Q. Well, there is more than a possibility of that. You know that, don't you?
>
> A. Well, there is a possibility that they sell, they put our parts into their products and sell it to the United States.
>
> Q. My question is, **you, in fact, know that happens, don't you**?
>
> A. Some of them, **yes**.

(A16927-28.)  Likewise, the head of Fairchild's Power Conversion group conceded that Fairchild knows its customers intend to sell to the United States:

> Q.    But you know that they intend to sell their power supplies, which include your chips, worldwide, including in the United States. Fair?
>
> A.    Yes.  I think worldwide, I should say yes, ***including United States***.  Right.

(A16788.)  Indeed, Fairchild knows its infringing chips are incorporated into U.S.-bound products like HP printer adapters, (A16794), and power supplies for Nokia, Panasonic, Motorola, Apple, Samsung, IBM, and Dell.  (A16774-76; A24175; A24946; A16794.)  And Fairchild does nothing to prevent customers from incorporating infringing chips into U.S.-bound products.  (A16927.)

The jury saw specific examples where Fairchild succeeded in convincing customers to import the infringing chips.  For example, Power Integrations purchased an HP printer with an Astec adapter that contained an infringing SG6846A at Best Buy in Michigan and admitted it into evidence as a physical exhibit.  (A24539-44; A16389-90.)  The pictures below show the Best Buy receipt (left), the bottom of the Astec power supply (middle), and the infringing chip (right):





(A24539-44.)  The SG6846A was one of Fairchild's largest revenue products in this area, and it was sold only to Astec for printer adapters.  (A16507.)  Moreover, Astec is the same customer for whom an exemplary indemnification agreement with Fairchild was presented.  (A24341; A16787-88.)  So both Fairchild's knowledge and intent that this infringing chip is sold in the United States was plain.

Three other examples also confirmed that infringing chips actually entered the U.S.  First, Power Integrations purchased an Acer notebook with a Lite-On adapter containing a Fairchild infringing LTA703S chip sold at Wal-Mart in Michigan, as shown by the images of the receipt (left), adapter (middle), and chip (right) below:

  

(A24534-38; A16391-92.)  Fairchild admittedly targeted Lite-On as a customer for infringing chips, (A16787), and, indeed, Power Integrations' Senior VP of Worldwide Sales had run into System General's then-CEO with a salesman at Lite-On.  (A16488.)  Second, Power Integrations purchased a Samsung notebook that was shipped to California and included a power adapter that contained an infringing Fairchild chip.  (A16606-07.)  Third, Power Integrations purchased infringing chips in Michigan from Fairchild's U.S. distributor Digi-Key Corporation.  (A16392-96.)

## II.  <u>The Patents-in-Suit</u>:  Power Integrations' Patents Cover Fundamental Technology, While Fairchild's is a Narrow Implementation of Prior Art.

### A.     <u>Power Integrations' '876 Patent</u>:  Frequency Jitter to Reduce Interference Without a Bulky Memory.

The '876 patent, filed in 1998, claims the approach to jitter that Power Integrations pioneered and Fairchild subsequently copied.  (A225-38.)  Previous attempts to reduce interference by varying switching frequency, such as the 1985 Martin patent and 1993 Wang article, differed from the '876 jitter technology in two important respects.  (A16888-90; A23853-62; A23989-92.)

First, the prior art varied frequency in a "pseudo-random" manner—in Martin's case, the circuit was for military applications where a user wouldn't want the enemy to lock onto a repetitive pattern (or "signature") of frequency variation.  (A23991 at 1:24-41, 2:41-44.)

Second, prior circuits achieved random variation by including a memory (red) that stored digital instructions for varying frequency and sent control signals to a digital-to-analog converter (blue), which could output those instructions as an analog signal that could be understood by the oscillator (yellow) that generates the switching frequency.  (A16888-90; A23853-62; A23989-92.)  The oscillator's frequency was then "fed back" to a counter (green) that stepped the memory through its stored instructions.  The images below show the prior circuits from Martin (left) and Wang (right):

13





Fig. 20.   Programmed PWM generator implementation with control input.

(A23990; A23861; A16888-90.)

By contrast, the '876 patent implements jitter by varying the switching frequency about a ***target*** frequency in a precise, cyclical way.  Figure 2 shows an example in which a counter's outputs (Q4-Q7) step the oscillator's frequency through a repeating set of 128 cycles, with the target frequency ($F_{AVG}$) in the middle.



(A227, A234 at 5:57-6:5; A16356-57; A16888-90.)  By varying frequency in this set manner, the '876 patent eliminated the need for a memory to store instructions, removing a bulky component and reducing the size of the electronic devices into

14

which the controller circuit was incorporated.  (*Id.*)  Figure 1 shows this novel circuit, in which the counter (green) sends control signals to the digital-to-analog converter (blue) that translates them for the oscillator (yellow), without a memory:



FIG. 1

(A226, A233-34 at 4:28-5:55; A16356-57.)

Asserted claims 1 and 21 reflect this invention.  Claim 21 is representative and recites a "frequency jitter circuit" (unlike the prior art random variation circuits) with the various components "coupled to" one another in a way that excludes the prior art intervening memory circuits:

> 21.  A ***frequency jittering circuit*** for varying a power supply switching frequency, comprising:
>
>> an oscillator for generating a signal having a switching frequency, the oscillator having a control input for varying the switching frequency; and
>>
>> means coupled to the control input for varying the switching frequency, including:  ***one or more current sources coupled to the control input***; and
>>
>> a counter coupled to the output of the oscillator and to the one or more current sources.

(A236 at 9:55-65.)  The court adopted three constructions relevant here, none of

which is disputed on appeal:

- The "means" limitation has the function of "varying the switching frequency of the oscillator" and a structure of a "digital-to-analog converter and a counter having at least four bits," (A47-48), and the digital-to-analog converter must include current sources.  (A44-45 n.13.)

- "Frequency jittering circuit" means "varying the switching frequency of a switch mode power supply *about a target frequency* in order to reduce electromagnetic interference."  (A47.)

- One circuit element is "coupled to" another if "they are connected such that voltage, current or control signals pass from one to the other."  (A17137.)

In particular, the "means" construction requires implementing the digital-to-analog converter using one or more current sources, which is not the only way of doing so, and which Fairchild never argued was in the prior art.  (A16890.)

This Court's prior opinion recognized that the '876 patent was a significant invention, affirming a finding that Martin didn't render the '876 patent obvious because "the record here is replete with testimony and other evidence demonstrating that Power Integrations' patented technology was far less obvious than Martin on its face suggests." *Power Integrations,* 711 F.3d at 1368.  Fairchild responded by asserting in this case that Martin and Wang (which discloses a similar circuit) *anticipate*, notwithstanding that Fairchild thought so little of that defense the first time around that it abandoned it.  When presented in this trial, the jury rejected the defense and the court denied JMOL.  (A145-47.)

**B.**    <u>Power Integrations' '605 patent</u>:  **Constant Current and Power Output Using a Variable Current Limit.**

The '605 patent permitted power supplies to reliably deliver a constant output current.  The patent summarizes the problem, noting that "changing input voltage" (*e.g.*, fluctuations in wall voltage), can vary the output current, and that "a fixed delay is inherent" between when the circuit senses the output current is too high and when it can react to stop the increase.  (A305 at 3:14-36.)  As discussed above, Power Integrations addressed that delay with a variable current limit threshold that increases while the switch is on (*i.e.*, when current is flowing).  (A16368-72.)

Figure 2 is an example of the invention's variable current limit.  The top two curves are generated by an oscillator that controls when the switch opens and closes—the "sawtooth" wave increases while the switch is on and decreases when it is off; the "duty cycle max" signal is "high" when the switch is on and "low" when the switch is off.  (A305 at 4:54-5:4; A300.)  The bottom curve is the current limit, which, based on its alignment with the other curves, shows that the current limit increases during the time the switch is on.  (*Id.*)



FIG. 2

17

Representative claim 1 recites a "control circuit" that regulates electricity flow with a "comparator" that outputs instructions based on the current flowing through the switch and a current limit threshold that increases during the switch on time:

> 1.  A power supply regulator, comprising:
>
>> a comparator having a first input coupled to sense a voltage representative of a current flowing through a switch during an on time of the switch,
>>
>> the comparator having a second input coupled to receive *a variable current limit threshold that increases <u>during the on time of the switch</u>*;
>>
>> a feedback circuit coupled to receive a feedback signal representative of an output voltage at an output of a power supply; and
>>
>> a control circuit coupled to generate a control signal in response to an output of the comparator and in response to an output of the feedback circuit, the control signal to be coupled to a control terminal of the switch to control switching of the switch.

(A306 at 6:10-23.)

Fairchild couldn't find any prior art that disclosed such a variable current limit threshold during the power supply's normal operation.  So Fairchild relied on U.S. Patent 4,736,238 to Maige, (A23774-84), even though its expert admitted that Maige used a *fixed* current limit circuit during normal operation, (A16816), the very thing Power Integrations had avoided.  Fairchild's theory was that certain "soft start circuitry" in Maige, which prevented a large in-rush of current when the device was first turned on, used an increasing current threshold.  But the PTO already considered soft start circuit prior art before allowing the claims.  (A16894.)  And, as Power

18

Integrations' expert explained, Maige's current limit does not increase "during the on time of the switch," even during the soft start period. (A16894-95, A16907-08.) The jury thus found Maige doesn't anticipate and the court denied JMOL. (A143-44.)

### C.    Fairchild's '972 patent:  Combining Jitter With Primary Side Control Using Two Distinct Feedback Signals.

Fairchild's '972 patent was filed in 2004 and combined two previously-known concepts—the jittering technology embodied in Power Integrations' prior '876 patent and "primary side" control, which refers to controlling a power supply's output based on information obtained from the power supply's input side. (A17047-50.) Primary side control had been implemented previously, such as in the 1998 Majid patent and Power Integrations' first generation "LinkSwitch" products initially sold in 2002. (A23774-84; A16352-53; A25148.) Skilled artisans had strong reason to combine primary-side control with jitter, given the description of jitter's advantages in the '876 patent. (A17049; A233 at 4:6-10.) And it was an easy combination—Fairchild (and Power Integrations) took the same jitter circuits from earlier secondary-side products and added them to the later-developed primary-side products. (*Id.*) Fairchild raised (and the parties debated) the difficulty of obtaining "accurate" primary-side control, but that was a red herring because the '972 claims don't require any particular degree of accuracy.

The '972 patent describes a primary-side control method that, although known in the prior art, differs from Power Integrations' unique approach in its accused,

second generation, LinkSwitch-II product. Figure 1 of the '972 patent shows the

claimed power converter, which receives a wall voltage ($V_{IN}$) and outputs a voltage

and current ($V_O$ and $I_O$) to an electronic device. (A254; A266 at 2:42-3:19.) The

converter includes a transformer (10), which isolates the wall voltage from the

electronic device, and a controller (70) that regulates power flow using two distinct

"feedback signals," an important difference with Power Integrations' products. (*Id.*)



FIG. 1

Figure 3 illustrates how the two feedback signals are generated, as it shows the

controller's internal structure. (A256; A268 at 5:1-34.) The circuit samples a sensed

voltage ($V_{DET}$) associated with an auxiliary winding ($N_A$) and uses that, along with a

signal representing the discharge time of the transformer ($S_{DS}$), to determine the

voltage that should be used for the "voltage-feedback signal" ($V_V$). (*Id.*; *see also* A257,

A267-70 at 9:56-59; *see also* 3:49-4:8, 9:10-10:3.) The circuit produces the "current

feedback signal" ($V_I$) by integrating a current signal ($V_{CS}$) associated with the

transformer's primary side over the discharge time. (*Id.*) The resulting feedback

signals are part of separate "control loops" for voltage and current—voltage is red,

and current is blue:



FIG. 3

Asserted claims 6, 7, 18, and 19 recite this approach to combining the specific primary side control loops and jitter. Claim 6 is representative and depends from unasserted claims 1, 2, and 5. Claim 1 provides the structural context, requires the two distinct feedback signals, and recites jitter in the "wherein" clause:

> 1. A power converter comprising:
>
>> a switch, responsive to a switching signal, to control electrical power in the power converter; and
>>
>> a controller to generate the switching signal and to control the switching signal in response to **a first feedback signal associated with a voltage control loop and a second feedback signal associated with a current control loop**;
>>
>> wherein the controller includes a pattern generator to generate a digital pattern and the controller uses the digital pattern for use in generating the switching signal as a frequency-hopping switching signal to the switch.

(A273 at 15:22-33.) Unasserted dependent claims 2 and 5 additionally require a transformer that includes an auxiliary winding on the primary side. (*Id.* at 15:34-49.)

Asserted claim 6 adds a key requirement (present in all asserted claims) that the first feedback signal is generated by sampling ***both*** a voltage ***and*** a discharge time:

> 6. The power converter of claim 5, wherein the controller generates the first feedback signal by ***sampling a voltage from the auxiliary winding of the transformer <u>and</u> a discharge time of the transformer***.

(A273 at 15:50-54.)  Power Integrations proposed this phrase be construed to mean what it says and what the preferred embodiment shows: "sampling both a voltage signal and a discharge time." (A25.)  But the district court adopted Fairchild's construction—"sampling a voltage from the auxiliary winding of the transformer when the transformer is discharging"—which read out the requirement of sampling a discharge time and replaced it with something absent from the claim.  (A25-27.)

Power Integrations' accused LinkSwitch-II controllers differ from the claims in multiple ways.  The LinkSwitch-II doesn't sample a discharge time, as claimed, but the district court's construction eliminated this simple non-infringement defense.  The LinkSwitch-II also doesn't use two distinct feedback signals to control output voltage and current.  (A17043.)  The jury agreed, finding no literal infringement, but nevertheless found infringement by equivalents, thus reading out that claim requirement.  (A538.)  Moreover, the LinkSwitch-II is, at most, only one component of the claimed power converter, and it has non-infringing uses, in applications that do not involve a transformer.  (A17039.)  In view of this undisputed fact, while the jury found direct infringement under the doctrine of equivalents by Power Integrations, it also found Fairchild failed to prove any inducement.

## SUMMARY OF THE ARGUMENT

***'972 patent***.  The court erroneously rewrote the claims, which require sampling both a voltage "and" a discharge time, to replace the word "and" with "during."  No intrinsic evidence supported such a rewriting.  The court further erred by upholding the equivalents finding where Fairchild's theory read out a key limitation—two distinct feedback signals—that was critical to the inventor's idea yet Power Integrations purposely avoided because it was disadvantageous.  The '972 claims were also obvious because the elements were in the prior art, there was a strong motive to combine them, and Fairchild's contrary arguments relied on an unclaimed requirement of "tight" primary-side current control.  Given these issues, the court need not reach Fairchild's inducement argument, but the jury's finding there was well-supported given Power Integrations' good faith belief in non-infringement and the fact the accused chips do not necessarily infringe when used in the U.S.

***Fairchild's Inducement***.  Substantial evidence supports the jury's inducement finding on the '876 and '851 patents.  Fairchild's chips necessarily infringe upon U.S. importation, sale, or use.  The jury properly found that Fairchild encourages customers to import and sell in the U.S. by designing the chips to meet U.S.-specific regulations, targeting U.S. sales opportunities, and supporting U.S. customers.  Moreover, the jury properly found that Fairchild intends customers to import into the U.S.  Fairchild admittedly knows customers sell "at least some" chips in the U.S., and the jury saw specific examples of Fairchild chips that had in fact been imported.

Fairchild's "nexus" arguments are misplaced because precedent imposes no such requirement, and, regardless, the jury could reasonably infer that Fairchild's conduct was causing customers to import and sell in the U.S.—if Fairchild hadn't designed its products for the U.S., they couldn't be sold here. The jury instructions properly stated the law, and Fairchild never objected to or sought removal of the language it now challenges on appeal. Moreover, the court was within its discretion to give a standard general verdict form.

**'876 patent.** Substantial evidence supported the jury's finding of no anticipation. Fairchild failed entirely to address one limitation of claim 21—"one or more current sources"—and the evidence showed this was neither express nor inherent in the prior art. Moreover, the jury reasonably credited expert testimony that two other limitations of both claims 1 and 21 were missing from the prior art.

**'605 patent.** Substantial evidence supported the jury's finding of no anticipation where Power Integrations' expert explained why the disputed limitation was absent and did not rely on any unclaimed requirement. But a new trial on inducement is necessary because the erroneous finding of no direct infringement, prompted by Fairchild's improper arguments, plainly infected the jury's determination.

**Injunction.** The court was within its discretion to enjoin Fairchild because the claimed technologies in Power Integrations' patents are critical to customers (and the other factors favored relief), and to not enjoin Power Integrations where Fairchild had licensed the '972 patent and all the asserted claims had been rejected in reexamination.

<u>ARGUMENT</u>

## I.    The Judgment on the '972 Patent Should Be Reversed or Vacated.

### A.    <u>Cross-Appeal</u>:  The District Court's Claim Construction Erroneously Ignored the Claims' Plain Meaning.

The district court erred by construing the term "sampling a voltage from the auxiliary winding of the transformer ***and*** a discharge time of the transformer" to read out the word "and," and instead require only "sampling a voltage from the auxiliary winding of the transformer ***when*** the transformer is discharging." (A25-27.)  This court reviews claim construction *de novo* where, as here, it was based solely on intrinsic evidence.  *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778. F3d 1021, 1023 (Fed. Cir. 2015).  "The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." *Thorner v. Sony Comp. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).  "There are only two exceptions to this general rule:  1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Id.*  Neither applies here, so ordinary meaning controls.

The claims' ordinary meaning could not be clearer.  The word "sampling" is followed by two items joined by the conjunction "and."  In ordinary English, this means that both items—voltage and discharge time—must be sampled.  The specification is in accord.  It discusses sampling (*i.e.*, measuring and holding) ***both*** a

voltage **and** the discharge time, and then using signals that represent those measured quantities to generate the "first feedback signal" and also to control the power converter's voltage output and current output. (A268-70 at 3:49-4:8, 5:1-16, 7:32-36, 7:48-55, 8:18-33, 8:49-67, 9:10-10:3; A256-57.) Indeed, Figure 3 shows the circuit is measuring and holding the elapsed discharge time in the signal ($S_{DS}$ in green).



FIG. 3

(A256.)

The district court, contrary to *Thorner*, departed from the claims' ordinary meaning without identifying any lexicography or disclaimer. The court side-stepped the claims' plain meaning by saying it was "grammatically ambiguous … what quantities are being joined by the word 'and.'" (A25.) But that's not the case, and, in any event, can't support the construction, which entirely eliminates the word "and." The court then stressed that the specification shows the controller sampling a voltage while the transformer is discharging. (A26.) That is certainly true, but it has nothing to do with the claim language—"and" does not mean "during" or "when," as the

26

court held.  The court was also troubled by the fact that "sampling" often refers to an operation on a waveform, not something done on a time.  (*Id.*)  But the court overlooked that "sampling," consistent with its plain meaning, here means measuring the elapsed discharge time in the switching cycle and holding that value for use in subsequent calculations, which is depicted in the specification with the discharge time signal ($S_{DS}$).  Indeed, the specification says that one purpose of measuring the discharge time (and one use of the resulting discharge time signal) is to determine which particular sampled value of the reflected voltage should be used as the first feedback signal.  (*See, e.g.*, A257, A267-70 at 9:56-59; *see also* 3:49-4:8, 9:10-10:3.)  The plain meaning of "and" in the claim—and Power Integrations' proposed construction applying that plain meaning—is perfectly consistent with the specification.

Moreover, the court's construction rewriting the clear claim language created problems for the analogous language in unasserted claims 8 and 20, which require generating the "second feedback signal by sampling of the sensed current from the sense circuit *and* the discharge time of the transformer."  (A273 at 15:58-61, 16:58-61.)  This claim language, particularly the parallel use of "and the discharge time," is consistent with the specification's description of generating the second feedback signal with a sampled value of the current and the measured discharge time (represented by the signal $S_{DS}$). (A260-71 at Fig. 7; 5:17-26; 12:34-55.)  But, in these claims, reading "and" to mean "when" or "during" results in a scientific impossibility, because the "sensed current" doesn't exist, and so cannot possibly be sampled, "when

the transformer is discharging." (A27; A3541-42.) Accepting the district court's construction would either render claims 8 and 20 inoperative or require construing the parallel language in them very differently from the disputed term in claims 6 and 18. Power Integrations' construction does neither.

The bottom line is that a court cannot rewrite the asserted claims for any reason. *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("This court, however, repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity."); *Novo Indus., LP v. Micro Molds Corp.*, 350 F.3d 1348, 1355-56 (Fed. Cir. 2003) (reversing claim construction because, even though the claim plainly contained an error, the intrinsic record failed to show how any such error should be corrected). Because the district court erroneously ignored this law, its judgment on the '972 patent must be vacated.

### B. <u>Cross-Appeal</u>: There Can Be No Infringement By Equivalents Because Fairchild's Theory Reads Out a Claim Element.

The '972 infringement finding should be set aside even under the district court's construction because the single feedback signal in Power Integrations' products is not equivalent to the two claimed feedback signals that, respectively, control output voltage and current. The district court's construction required two "distinct" signals, (A24-25), which the jury found that Power Integrations' products lack by finding no literal infringement. (A538.) Equivalency is precluded as a matter of law for two independent reasons.

First, not using two distinct signals to control voltage and current can't be equivalent to using distinct signals—the signals either are distinct or they aren't. The '972 patent touts using two distinct feedback signals; one controls the output voltage using a sensed voltage of the transformer's auxiliary winding, while the other controls the output current using a sensed current through the transformer's primary side. (A266 at 2:42-51.) The inventor described his a-ha moment as deciding to use a sensed current to control the output current, (A16917), which necessitates using a second feedback signal, and he contrasted prior art that controlled output current by sensing a voltage. (A16924.) By contrast, Power Integrations' LinkSwitch-II products use a single sensed voltage at a "voltage feedback input" to control both output voltage and current, as shown in the figure below from a Power Integrations datasheet. (A24292, A17043, A17036-37.)



The result is a simpler and more reliable circuit because feedback loops are difficult to work with and potentially make the power supply "unstable or not operate at all." (A17044.)  Given these differences, the two approaches cannot be equivalent as a matter of law.  *Am. Calcar, Inc. v. Am. Honda Motor Co., Inc.*, 651 F.3d 1318, 1339 (Fed. Cir. 2011) (signal from one source not equivalent to signals from "a plurality of sources" because this would "vitiate that claim limitation by rendering it meaningless").

Second, Fairchild's only evidence of equivalency was a single, conclusory question-and-answer with its expert that was not the "particularized testimony and linking argument" required by precedent.  *Texas Insts., Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567-68 (Fed. Cir. 1996).  The expert identified a generic function, way, and result that he said are accomplished by both the claimed invention and the accused products.  (A17026-27.)  But he never actually analyzed how the "way" the invention carries out its function (two distinct feedback signals) could be substantially the same as the "way" Power Integrations' products work (a single feedback input). Indeed, his testimony never grappled with the requirement of distinct feedback signals at all.  His conclusory analysis was thus insufficient as a matter of law.

## C.     Cross-Appeal:  The Claims Were Obvious Based on the Prior Art.

The '972 non-obviousness finding below was legally erroneous because Fairchild only distinguished prior art using unclaimed limitations about the "accuracy" or "tightness" of primary-side current control.  Obviousness is a question of law

reviewed *de novo*, *Wyers v. Master Lock. Co.*, 616 F.3d 1231, 1237 (Fed. Cir. 2010), and the relevant facts here weren't disputed.  All claimed elements were present in the combination of two references—the Majid patent, which disclosed the primary side control limitations (including the two feedback signals), and Power Integrations' '876 patent, which disclosed jitter.  (A17048; A17061-62; A24524-33; A225-37.)  There was strong reason to put them together—skilled artisans knew that jitter reduced electromagnetic interference, so it was a valuable addition to existing primary-side control circuits.  (A17049.)  The '876 patent itself explained that its jitter invention resulted in "a compact and inexpensive power supply" with "minimal EMI emissions."  (A233 at 4:6-10.)  The debate was over how difficult it was to combine them.  Power Integrations' expert testified it was easy, (A17049), while Fairchild's expert said it "takes effort" and "took a while for the two to come together," and that Power Integrations' first product combining the two (the LinkSwitch-LP) didn't have "tight current voltage regulation."  (A17057.)  Fairchild's expert also added that taking a circuit from one reference and putting it in another "doesn't guarantee anything is going to work."  (A17058.)

Fairchild's testimony doesn't support non-obviousness.  For starters, an idea can "take effort" to implement yet still be obvious under § 103.  Everything takes at least some effort—the question is whether that effort is within the skilled artisan's reach.  Likewise, obviousness requires "only a reasonable expectation of success, not a guarantee."  *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007).  More

fundamentally, Fairchild's testimony was based on the notion that it was hard to combine jitter with "tight" primary-side control. (A17057-58.) But nothing in the claims requires "tight" primary-side control, so that cannot be used to preserve their validity. *Soverain Software LLC v. Newegg Inc.*, 705 F.3d 1333, 1339-40 (Fed. Cir. 2013). The claims simply recite a power converter that has both the recited primary-side feedback signals/control loops and jitter, regardless of how accurate its resulting regulation is. And, on that issue, both Power Integrations and Fairchild created products that combined the two by taking the identical jitter circuits that had been previously used and adding them, in the same form, to designs with primary-side control. (A17049; A16365.)

Fairchild's alleged secondary indicia of non-obviousness were irrelevant for the same reason. Fairchild's arguments about commercial success, long-felt need, and failure of others was all tied to the alleged difficulties with designing a product with "tight" primary-side control. But the claims don't require that, so there is no nexus between Fairchild's arguments and the claimed invention. The only relevant evidence left, then, is Power Integrations' testimony that all elements were present in the art, there was a reason to combine them, and that it was straight-forward to do so. (A17047-50.) The claims are thus obvious as a matter of law.

### D.    Fairchild's Motion for JMOL of Inducement Was Properly Denied.

Because the '972 patent is both not directly infringed and invalid, the Court need not reach Fairchild's argument (at 51-54) for JMOL of inducement.

Nevertheless, two important differences between the parties' positions show that the jury properly found no inducement by Power Integrations, while still finding inducement by Fairchild (as discussed in Section II below).

First, Power Integrations has a good faith belief it does not infringe the '972 patent, reflected in the claim construction and non-infringement discussions above. The jury heard Power Integrations' non-infringement defense applying the district court's construction and agreed in part, finding no literal infringement. (A538.) Although it (incorrectly) disagreed on equivalents, the jury could have properly concluded that Power Integrations also had a good faith, reasonable belief that its products were not equivalent. This stands in stark contrast to Fairchild, which does not believe any non-infringement defense enough to even pursue it on appeal.

Second, Power Integrations' products do not necessarily infringe the '972 patent even if they enter the U.S. The '972 patent covers only use of Power Integrations' controller chips with a transformer, and Fairchild's expert admitted that the accused chips are sometimes used without a transformer. (A17039.) Fairchild thus bore the burden to prove infringing use, and the jury could reasonably have found that Fairchild did not meet this burden. By contrast, Fairchild's chips necessarily infringed when imported, and Fairchild admitted that at least some of its chips are incorporated into end products that enter the U.S.

## II.    The Jury's Inducement Finding on Power Integrations' '876 and '851 Patents Was Well-Supported in Fact and Law.

### A.    Substantial Evidence Supported the Jury's Inducement Finding.

A defendant is liable for inducing infringement when (1) there are underlying acts of direct infringement, (2) the defendant takes action intending to cause those infringing acts, and (3) the alleged infringer acts with knowledge (or willful blindness) that the acts constitute infringement.  *Global-Tech Appliances, Inc. v. SEB SA*, 131 S.Ct. 2060, 2068 (2011).  "Infringement is a question of fact, reviewed for substantial evidence when tried to a jury."  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1309 (Fed. Cir. 2009).  Substantial evidence supports the jury's finding that each element is met with respect to Fairchild.

### 1.    The Jury Had Both Specific Examples and Fairchild's Admission of Underlying Direct Infringement.

There is no dispute that Fairchild's chips necessarily infringe Power Integrations' patents if they enter the United States.  Fairchild admitted as much in the district court, stating that "if the claims are found to read on the relevant circuit"— which the jury found they do and Fairchild doesn't challenge on appeal—"then the Fairchild products will necessarily infringe when offered for sale, sold, or imported in the U.S. and used as intended in a power converter."  (A438.)  So the sole question for direct infringement is whether Fairchild's accused chips entered the U.S. Substantial evidence showed that they did.

Start with the direct evidence.  Power Integrations identified actual examples of consumer products—namely, power adapters for an HP printer, an Acer laptop computer, and a Samsung notebook—that contained infringing Fairchild chips and were purchased in the United States.  (A16389-92; A24534-44; A16599; A16606-07.) Power Integrations also purchased Fairchild infringing chips in Michigan from a U.S. distributor.  (A16392-96.)  Moreover, multiple Fairchild executives admitted that Fairchild's infringing chips are incorporated into consumer products, at least "some" of which are imported into the U.S.  (A16927-28; A16788.)

Significant circumstantial evidence also showed that Fairchild chips were imported into the United States.  Fairchild targeted opportunities for incorporating its products into end-products that were destined for the U.S. market.  (A16928-31, A24495, A24497, A24492.)  Fairchild designs the products, at customer request, to enable compliance with U.S.-specific regulations.  (A16523-24; A16794; A16778; A16400, A16500-01; A24968-5010; A24931.)  Fairchild's website allows U.S. customers to find a distributor who can sell an infringing chip in their state. (A16927.)  And Fairchild has a U.S. technical support center.  (A16402, A24174.)  The jury could properly infer that this evidence shows that infringing Fairchild chips enter the U.S., especially because Fairchild promotes the infringing use by honoring customer requests to make chips suitable for the U.S.  *See Lucent*, 580 F.3d at 1318 (upholding finding of underlying direct infringement where the defendant "designed

the accused products to practice the claimed invention" and "instructed its customers to use the accused products in an infringing way").

The evidence here thus distinguishes the parties' prior case, *Power Integrations*, 711 F.3d at 1374-76, where the court's sole basis for reversing an inducement finding was the perceived lack of evidence that an infringing Fairchild chip entered the U.S. The court there believed that "[t]here is no evidence that the imports of Samsung products included chargers, nor is there evidence that any included chargers incorporated Fairchild's infringing circuits." *Id.* at 1376. Here, by contrast, Power Integrations identified examples of consumer products containing the infringing chips that entered the U.S., and Fairchild admitted that at least "some" end-products containing infringing Fairchild chips enter the U.S. Fairchild even acknowledges in its brief (at 19) that there was "direct infringement proven at trial."

### 2. The Jury Properly Concluded that Fairchild Took Actions Intending to Cause Infringement.

Substantial evidence showed that Fairchild has affirmatively encouraged customers to import accused chips into the U.S., and that Fairchild intends that they do, so Fairchild can make more money. For example, the jury saw examples where Fairchild targeted sales of its chips for incorporation into U.S.-bound products (*e.g.*, ██████████████████████). (A16928-31, A24495, A24497, A24492.) Fairchild's Executive VP admitted that Fairchild "intended to go after" and "make" those sales. (A16929, A16931.) Moreover, Fairchild designed its products so that

Confidential Material Subject to a Protective Order Redacted on this Page

they would be "good for sales into the United States," (A16928), including by meeting customer demand that they comply with U.S.-specific regulations, such as the particularly demanding California Energy Commission and Energy Star Level 5 standards.  (A16523-24; A16794; A16778; A16400, A16500-01; A25065; A24969-70; A24931; A24908.)  Meeting customer demand for products that comply with U.S.-regulations is tantamount to advertising and instructing the infringing use, because the chips necessarily infringe when imported to the U.S.  Fairchild also selected specific products "███████████," (A25019-24), and it provided demonstration circuit boards with infringing chips, technical specifications, and other support to U.S. customers (and potential customers).  (A16514-16, A25016-18, A25019-24; A25025-26; A25027-35; A25036-47; A16524; A16794; A24492; A16491; A24700-27; A24728-59; A16402, A24174.)  Moreover, Fairchild indemnified multiple customers for U.S. patent infringement, (A16787-88), and, in an exemplary agreement, System General acknowledged that its customer's products (including those containing the infringing chips) "███████████." (A24341.)

This Court has previously held similar evidence sufficient to support a jury finding of affirmative acts with intent to encourage infringement.  *E.g., Lucent*, 580 F.3d at 1322 ("Evidence of active steps taken to induce infringement, such as advertising an infringing use, can support a finding of an intention for the product to be used in an infringing manner."); *Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1272 (Fed. Cir. 1986) (finding inducement based on "circumstantial evidence of

37

extensive puzzle sales, dissemination of an instruction sheet teaching the method of restoring the preselected pattern with each puzzle, and the availability of a solution booklet on how to solve the puzzle").

The inference of intent is particularly strong here because Fairchild had an economic motivation to promote and encourage importation of consumer products with the infringing chips into the U.S. Fairchild's witnesses naturally admitted that "we want to sell as many parts as we can," (A16932), and that their "intention was always to have products for the global marketplace." (A16400.) Fairchild's brief (at 27) likewise states that Fairchild "focuses upon the quantity of chips sold" and "helps its customer to maximize global sales and increase demand for Fairchild products." Although Fairchild's witnesses testified they were "indifferent" to the chips' ultimate destination, that conflicts with their other admissions—Fairchild sells more total parts because some are incorporated into U.S.-bound products, especially since the U.S. accounts for at least a third of the worldwide electronics market. (A16467.) The jury thus properly rejected Fairchild's self-serving denials and found that it intends customers to import and sell accused products in the U.S. so it can make more money. *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 939-40 (2005) (holding that the fact "the commercial sense of [defendants'] enterprise turns on high-volume use, which the record shows is infringing" supported an inference of intent).

Fairchild's attempts to explain away this evidence should be rejected. This is not a case, as Fairchild argues (at 23-24), of "simply selling a product to a person with

knowledge that he may resell it illegally." Fairchild advertises that its chips are available in the U.S., advertises that they comply with U.S. regulations, and specifically targets opportunities where the chips are intended for the U.S. market. As a result, this case falls squarely within *Kalen Co. v. Harper Brothers*, 222 U.S. 55 (1911), cited by Fairchild, which affirmed a finding of copyright infringement where the defendant "not only expected but invoked by advertisement" the infringement, and is not like *Graves v. Johnson*, 179 Mass. 53 (1901), also cited by Fairchild, where knowledge alone didn't trigger accomplice liability.

Nor is this a case, as Fairchild suggests (at 13-14, 23), where the defendant's product has both infringing and non-infringing uses. Fairchild doesn't dispute that the U.S. importation, use, or sale of its products ***necessarily*** infringes the patents-in-suit. (A438.) Therefore, *Grokster*'s comment that "ordinary acts incident to product distribution" do not "support liability in themselves" is inapplicable here because ***any*** U.S. sale, importation or use infringes. By contrast, *Grokster* dealt with file sharing software that could be used ***in the U.S.*** in a non-infringing way, so U.S. promotion and support of the overall product could be unrelated to infringement. Here, Fairchild's promotion of and technical support for putting its chips into U.S.-bound products aren't "ordinary acts" at all—they are the very type of "instructions" to infringe that *Grokster* held justified a finding of inducement liability.

It is no answer for Fairchild to hide (at 26-27) behind selling its chips "into a complex, multi-channel global supply chain." Fairchild wants its chips to enter the

U.S. so it can make more money and takes affirmative steps to ensure they do.  That there may be several links in the chain between when a chip leaves Fairchild's factory and when an end-product containing the chip is imported and sold in the U.S. is irrelevant.  Fairchild ensures the chip can be sold in the U.S. and wants it to be.  That suffices to show the required acts and intent.

Fairchild's other arguments should be rejected because they simply reargue the jury's factual findings.  For example, Fairchild tries (at 29-31) to explain away designing its products to meet U.S. regulations because they supposedly overlap with those of other countries.  But the jury heard testimony that the Energy Star regulations were indicative of U.S.-bound products, and that the California standard was particularly high (and unique to the U.S.).  (A16523-24; A16794; A16778; A16400, A16500-01; A24968-5010; A24931; A25065; A24908.)  The jury properly credited this evidence over Fairchild's self-serving rationalizations.  Fairchild's claim (at 31) that it only complied with U.S. standards as a condition of "playing in the power-supply market at all," actually underscores its intent—Fairchild **_wants_** its products to enter the U.S., because, if they couldn't, customers wouldn't buy them at all, to ship anywhere, since customers demand universal power supplies.  (A16778.)

Fairchild's spin on its indemnification agreements is similarly flawed.  The jury was entitled to conclude that Fairchild's "primary purpose" in indemnifying customers was to encourage them to sell the products in the U.S. because, unlike the indemnity provision in _MEMC Elec. v. Mitsubishi Materials Silicon Corp._, 420 F.3d 1369,

1378 (Fed. Cir. 2005), an exemplary agreement with ████████████
████████████████████████████████████████████████
████████████████████████ (A24341; A16787-88.)  The jury
was entitled to reject Fairchild's claim (at 32 n.2) that the agreement "was not
applicable to sales after the 2007 merger," because the agreement itself doesn't specify
a termination date, and Fairchild presented no subsequent agreement rescinding it.  It
is no answer for Fairchild to say (at 31) that it must offer indemnification because all
its competitors do.  This only underscores that Fairchild offers indemnification to
encourage customers to buy and ship Fairchild products worldwide (including to the
U.S.)—if Fairchild didn't offer the same terms everyone else did, customers would
take their business for U.S.-bound products elsewhere.

Finally, Fairchild errs in arguing (at 32) that its "failure to prevent U.S. sales of
products containing the accused chips" is not evidence of inducement.  Fairchild's
cases hold (and we agree) that inaction alone is insufficient.  But, here, Fairchild took
the other affirmative acts to promote infringement described above.  So the fact
Fairchild both took those acts *and* failed to discourage or prevent infringement is
further evidence of its unlawful intent.  *Grokster*, 545 U.S. at 939 & n.12 (holding that
other evidence of unlawful intent was "given added significance" because neither
defendant "attempted to develop filtering tools or other mechanisms to diminish the
infringing activity using their software").

Confidential Material Subject to a Protective Order Redacted on this Page

### 3. Fairchild Knew That U.S.-Bound Products Incorporating Its Chips Would Infringe.

The jury also properly concluded that Fairchild both knows its chips are incorporated into end-products that enter the U.S. and knows that, once that happens, they necessarily infringe Power Integrations' patents. As discussed above, Fairchild admittedly knows its products enter the U.S. (A16927-28; A16788.) Moreover, the jury soundly rejected Fairchild's non-infringement defenses at trial, and, although Fairchild says it had "strong non-infringement defenses" on the '876 and '851 patents, it notably does not pursue any of those issues on appeal (or, indeed, any defense on the '851 patent at all). The jury was thus entitled to reject the conclusory and self-serving assertion of a Fairchild executive that "we respect people's intellectual property." (A16786-87.) In fact, although Judge Stark excluded it from trial, Fairchild's history tells a different tale—it has been caught red-handed for infringing the '876 and '851 patents before and "fostered a corporate culture of copying." *Power Integrations*, 711 F.3d at 1369.

### B. Fairchild's "Nexus" Argument Conflicts With Precedent and Is Unsupported by the Facts Here.

Perhaps recognizing the jury's verdict is well-supported under the correct legal standard, Fairchild asks (at 19-22) for a new rule that requires proof of a "nexus" between its conduct and each individual act of underlying direct infringement. Fairchild's argument is based both on a mistaken factual premise and a mistaken reading of precedent.

We start by correcting the facts.  Fairchild's conduct **was** connected to **all** the underlying direct infringement because it created demand for accused chips in U.S.-bound products that necessarily infringe upon importation.  By designing its chips to comply with U.S. regulations, Fairchild enabled downstream customers to sell them here.  By targeting opportunities for its chips to be designed into end-products bound for the U.S., Fairchild causes customers to select its chips for U.S. products.  By listing U.S. distributors on its website, Fairchild helps customers to buy its chips in the U.S.  And by providing demo boards and product information to U.S. customers, Fairchild encourages them to buy.  If Fairchild's activities weren't creating U.S. demand for its products, then it wouldn't be engaging in them—Fairchild wants to "sell as many parts as we can," (A16932), and if this promotion wasn't increasing sales, Fairchild wouldn't bother.  The jury thus properly inferred that Fairchild's conduct caused a category of others (downstream customers that import and sell end-products in the U.S. containing Fairchild's chip) to directly infringe.

Fairchild's spin on the law is equally mistaken.  In fact, *Dynacore Holdings Corp. v. U.S. Philips*, 363 F.3d 1263 (Fed. Cir. 2004), shows that Fairchild is liable for all chips that enter the U.S., because *Dynacore* permits "plaintiffs who identify an entire category of infringers (*e.g.*, the defendant's customers)" to recover "damages or injunctions across the entire category."  *Id.* at 1274.  That describes this case to a T—Fairchild's chips necessarily infringe upon U.S. importation, use, or sale, so Fairchild is liable for damages caused by any such conduct.  Therefore, the jury properly held Fairchild

liable for the underlying acts of this whole category of infringers, specific examples of which were shown at trial by the end-products containing Fairchild chips that were purchased in the U.S.  (A16389-96; A24534-44; A16606-07.)

By contrast, none of Fairchild's cited cases (*DSU*, *Crystal Semiconductor*, *Aro*, *Water Techs., Wordtech*, or the prior *Power Integrations* opinion) addressed this issue, and none imposed an onerous requirement that separate "nexus" evidence must be introduced for each and every act of underlying direct infringement, as Fairchild asserts.  For example, *Power Integrations* simply found there was insufficient evidence of underlying direct infringement—it said nothing about a "nexus."  Fairchild is thus wrong to try to limit liability to the specific examples presented at trial.  *Dynacore* expressly permits proof of category-wide infringement where, as here, the defendant's product necessarily infringes upon U.S. import, sale, or use.  Power Integrations provided that category-wide proof given the evidence discussed above.

## C.     The Jury Instructions and Verdict Form Were Proper.

Fairchild's challenges to the jury instructions and verdict form (at 33-43) related to inducement are also without merit.  We discuss each in turn.

### 1.     The Jury Was Properly Instructed, and Fairchild Waived Any Objection.

The jury instruction on inducement correctly stated the law, and, regardless, Fairchild has waived its objection by not raising it below.  The district court's instruction largely tracks the Federal Circuit Bar Association's model, and Fairchild

does not dispute that it correctly states the three elements of inducement.  (*Compare*

A510-11*, with* A373.)  Instead, Fairchild complains about two sentences (emphasized

below) that clarified the standard for determining whether Fairchild had the requisite

intent for inducement:

> In order to establish active inducement of infringement, it is not sufficient that others directly infringe the claim.  Nor is it sufficient that the party accused of infringement was aware of the acts by others that directly infringe.  Rather, in order to find inducement, you must find that the party accused of infringement intended others to use its products in at least some ways that would infringe the asserted claims of the patent.  ***However, that infringement need not have been actually caused by the party's actions.  All that is required is that the party took steps to encourage or assist that infringement, regardless of whether that encouragement succeeded, or was even received.***

(A510.)  But Fairchild never objected to these sentences in the district court.  It thus

waived any ability to challenge the instruction in this Court other than for plain error,

which it has not attempted to show.  *See* FED. R. CIV. P. 51(c)(1) (explaining a party

must object to an instruction by "stating ***distinctly*** the matter objected to and the

grounds for the objection").

Fairchild cannot show it preserved an objection to this precise language.

Although Fairchild initially proposed an instruction that omitted those two sentences,

(A373, A1318), its accompanying brief raised no objection to them.  (A428.)

Moreover, Fairchild never told the district court in the subsequent discussions on the

instruction that it wanted this language removed.  Instead, Fairchild sought the further

addition of different language requiring a customer-by-customer finding.  (A16943-49,

A17066-69; A460 (court's initial proposed instruction).)  When the district court

45

declined to include such language, Fairchild made only a generic objection to the entire instruction—"we object to Jury Instruction 4.5"—that did not alert the court that it wanted the two sentences it now challenges deleted.  (A17179.)  At best, this vague objection would preserve only its previous request for the additional customer-by-customer language.  Even Fairchild's post-trial brief seeking a new trial never identified the inclusion of the emphasized language as error, instead arguing about the refusal to give the additional, different language that it wanted.  (A17872-75.)  In these circumstances, Fairchild forfeited its ability to object to the language it now challenges on appeal—Fairchild's complaints about a different aspect of the instruction do not preserve a challenge to language it never asked the district court to delete.  *See, e.g., Black v. Stephens*, 662 F.2d 181, 184 n.1 (3d Cir. 1981) ("A party may not state one ground when objecting to an instruction and attempt to rely on a different ground for the objection on appeal.").

Regardless, the instruction correctly states the law.  Both this Court and the Supreme Court have held that a defendant's acts to encourage direct infringement are probative of an unlawful intent, even if customers do not learn of them or the acts don't cause the customers' direct infringement.  *See Ricoh Co., Ltd. v. Quanta Comp., Inc.*, 550 F.3d 1325, 1341-42 (Fed. Cir. 2008) ("[T]he district court erred to the extent that it discounted [plaintiff's] evidence of [defendant's] intent as failing to present evidence that [defendant] communicated the nature of its actions to alleged direct infringers."); *Grokster*, 545 U.S. at 938 (holding that internal draft advertisements were probative of

inducement).  Power Integrations told the district court it was asking for the now-disputed language to set forth the correct standard for intent.  (A1336.)  Both *Ricoh* and *Grokster* amply support doing so.  To the extent Fairchild now suggests (at 35-36) that the language implied something else, then Fairchild should have asked the district court to modify or delete the language, yet did neither.  In fact, Fairchild has embraced the language of this instruction in another case between the parties, recently asking for and getting this same jury instruction when trying again to prove that Power Integrations induced infringement of the '972 patent.  *See Fairchild Semiconductor Corp. v. Power Integrations, Inc.*, Case No. 12-540 LPS (D. Del.), Doc. No. 320 at 42.

Fairchild is wrong to argue (at 36-37) that *Grokster* and *Ricoh* somehow exonerate it.  *Grokster*'s recitation of the inducement standard is consistent with the jury instruction here and does not mention any "nexus" requirement:

> [O]ne who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties.

*Grokster*, 545 U.S. at 936-37.  The evidence here is comparable:  Fairchild distributes its chips with the purpose that some will enter the U.S. and infringe Power Integrations' patents, as shown by its act of designing the chips to comply with U.S. regulations and targeting them to customers whose end market is the U.S.  Likewise, *Ricoh*'s suggestion that the evidence there could support inducement for some customers but not others has no applicability here, where Fairchild engaged in the

47

same conduct with respect to *all* its customers, because it wanted to sell as many products as it could to as many customers as it could.

Fairchild also fails to show that any error in the instruction was prejudicial. As discussed above, Fairchild ensured its products complied with U.S. regulations for the benefit of *all* customers, and it would have been impossible for these customers to import products containing the chips into the U.S. if they didn't comply with those regulations. Fairchild's conduct thus necessarily caused any underlying direct infringement. Moreover, Fairchild's complaints (at 38-39) about prejudice in the damages trial are misplaced. The issue in the liability trial was simply whether Fairchild induced infringement in "at least one" instance—any issues regarding the amount of damages due to Power Integrations as a result of that infringement are the exclusive provenance of the damages jury.

### 2. The District Court Didn't Abuse Its Discretion by Using the General Verdict Form Used in Many Prior Cases.

The district court did not abuse its discretion in obtaining a general verdict on inducement, as has been done in countless other cases, rather than using Fairchild's proposed customer-by-customer form. Fairchild does not identify any court that has used its proposed form, much less any case requiring it. This should not be the first.

In fact, precedent is inconsistent with requiring customer-by-customer findings. "This court has upheld claims of indirect infringement premised on circumstantial evidence of direct infringement by unknown parties." *In re Bill of Lading*, 681 F.3d

1323, 1336 (Fed. Cir. 2012).  Moreover, "a plaintiff's indirect infringement claims can succeed at trial absent direct evidence of a specific direct infringer."  *Id.*  That is particularly true where, as here, a defendant's product necessarily infringes upon U.S. importation, and thus an entire category of customers directly infringe.  *Dynacore*, 363 F.3d at 1274.  If a plaintiff in these circumstances is not even required to identify specific direct infringers, then it cannot be error for the district court to decline to give a verdict form requiring the jury to list specific direct infringers.

It makes no difference that this case involved bifurcation.  The liability jury's only task was to determine if there was "at least one" act of underlying direct infringement, *Lucent*, 580 F.3d at 1318, and its verdict indicates that it did.  The damages jury will now quantify the damages that are due to that infringement, including hearing evidence on the amount of Fairchild infringing chips that enter the U.S.  There is no Seventh Amendment problem because the damages jury will not be reexamining any issue decided by the liability jury—the damages jury's sole mission will be to determine the harm to Power Integrations due to Fairchild's infringement, an issue not resolved by the first jury.

*Lucent* itself demonstrates that different juries may determine liability and damages.  It affirmed a first jury's inducement finding yet remanded for a new damages-only retrial by a different jury.  *Lucent* expressed no qualms about a danger of inconsistent verdicts or about the damages jury impinging on the liability jury's findings—if there had been such a risk, the Court would have been required to

49

remand for a new trial on all issues under *Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494 (1931), which it did not do.

Fairchild's cited prisoner class action case, *Blyden v. Mancusi*, 186 F.3d 252 (2d Cir. 1999), is inapplicable. There, complicated liability and damages issues arose from many different potential acts of "reprisal" after a prison riot (from severe beatings and torture to more modest measures needed to re-secure the prison) carried out by a range of defendants (from officers who carried out the beatings to supervisors who allegedly failed to prevent them). The court had to reverse where the convoluted bifurcation procedure raised the risk that the second jury could award damages for acts the first jury thought justified, or even award damages against a defendant the prior jury thought innocent. *Id.* at 268-69. Here, by contrast, Fairchild's tortious conduct (inducing infringement) is the same in all instances, and the first jury's verdict means that it found Fairchild liable for the entire class of infringement discussed at the first trial—a class for which the specific instances presented at trial were examples. The second jury here cannot award damages for acts the first jury found non-infringing because there were no acts the first jury found non-infringing.

Finally, the district court had a good practical reason not to require a customer-by-customer showing. Fairchild had refused to produce worldwide sales information on a customer-by-customer basis in discovery and provided it to Power Integrations only days before the trial. (A16944; A24900.) Having withheld this information

during discovery, Fairchild cannot now complain that customer-by-customer proof was lacking.

## III. The Jury's Finding of No Anticipation of the '876 Patent was Supported by Substantial Evidence.

Fairchild presents no basis to disturb the jury's well-supported finding that the prior art did not anticipate claims 1 or 21 of the '876 patent. "Anticipation is a question of fact, and this court reviews the jury's findings for substantial evidence." *SynQor, Inc. v. Artesyn Techs.,* 709 F.3d 1365, 1373 (Fed. Cir. 2013). "Anticipation requires the presence in a single prior art disclosure of all elements of a claimed invention arranged as in the claim." *Id.* at 1375. The prior art was missing multiple elements of each claim of the '876 patent.

### A. Fairchild Ignores the "Current Source" Limitation of Claim 21.

Fairchild's anticipation argument for claim 21 fails at the outset because it never attempts to show the limitation—"means coupled to the control input for varying the switching frequency, ***including: one or more current sources coupled to the control input***"—is present in Martin or Wang. The district court held the structure had to include at least one current source and couldn't use only "voltage sources or capacitors." (A44-45 n.12.) Yet Fairchild entirely ignores this requirement.

No evidence suggested either Martin or Wang disclosed the "current source" limitation. Power Integrations' expert explained that neither Martin nor Wang disclosed implementing the means for varying the frequency using a current source,

(A16890), and Fairchild's expert admitted that he didn't identify such a disclosure in Martin or Wang.  (A16814-15.)  Moreover, the limitation wasn't inherent—everyone agreed there were multiple ways to design digital-to-analog converters, some of which did not include current sources.  (A16890; A16814-15.)  Power Integrations' expert gave an example: using a "resistive voltage divider" digital-to-analog convert that "wouldn't have a current source anywhere in there."  (A16890.)  And Fairchild's expert based his inherency opinion on the fact a digital-to-analog converter "could" have current sources, (A16824), which is the wrong legal standard.  *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1269 (Fed. Cir. 1991) ("Inherency, however, may not be established by probabilities or possibilities.").  So the jury's finding that the prior art didn't anticipate claim 21 was supported by substantial evidence.

## B.     The "Jitter" Limitation of Claims 1 and 21 Was Missing from the Prior Art.

Substantial evidence also supported the jury's finding that the prior art did not disclose a "frequency jitter circuit," as required by claims 1 and 21.  The court's construction required a circuit that does more than simply vary the frequency—it must vary "about a ***target*** frequency."  (A47.)  Figure 2 exemplifies such an approach, because the counter controls the frequency in a precise way, stepping it from a preset minimum ($F_{BASE}$) to a preset maximum ($F_{PEAK}$) in a specific number of cycles, so the target frequency is in the middle.  (A227, A234 at 5:57-6:5; A16356-57.)



By contrast, Martin disclosed frequency variation that was "as close to noise as possible" with "no pattern to it" to avoid producing a detectable "signature" or target frequency. (A16888-89.) Likewise, Wang disclosed variation that was "just everywhere" and had "no target that you can identify." (A16889.) Power Integrations' expert used Wang's reported frequency variance to generate the graph below, which illustrates its randomness:



(A16889; A23858.) Even Fairchild's expert admitted that Martin disclosed "pseudorandom" frequency variation, (A16815), the antithesis of varying about a target. The jury thus reasonably concluded that Martin and Wang do not anticipate.

The jury properly rejected Fairchild's attempt (at 47-48) to equate the claimed variation around a "target" frequency with the fact that a skilled artisan could, after-the-fact, calculate an "average" frequency from Martin or Wang. Power Integrations' expert made clear that, although the skilled artisan could perform such a calculation, "that's distinct from what is required by the patent." (A16907.) One can of course calculate an average of any random set of numbers. But the word "target" denotes something set in advance—you wouldn't describe a place you stumbled upon by happenstance as your "target." That the '876 patent proposed cyclically varying frequency and setting the "target" in the disclosed embodiment to also be the "average," (A16356), does not mean that any circuit with an average also has a "target." Anyway, the application of the court's construction to the prior art is a quintessential factual dispute, and the jury's decision to credit Power Integrations' expert was supported by substantial evidence.

### C.     The Prior Art Counters Were Not "Coupled to" a Digital-to-Analog Converter, as Claims 1 and 21 Require.

Substantial evidence also supported a finding that Martin and Wang did not disclose a counter "coupled to" a digital-to-analog converter because they were not "connected such that voltage, current or control signals pass from one to the other," as required by the court's construction. (A17137.) Each reference included a memory between the counter and the digital-to-analog converter, which "intentionally scrambled" the control signals, such that "they don't go through," and neither

voltages nor currents passed through either. (A16889-90; A16906; A23990; A23861.) Indeed, even Fairchild's expert admitted that the memory outputs different digital bits to the digital-to-analog converter than the bits it receives from the counter because "that's the point." (A16815.) The jury thus could reasonably find that a memory "decoupled" the counter and digital-to-analog converter in the prior art circuits.

Fairchild's contrary argument (at 45-47) is irrelevant to the real issue. Although the court's construction doesn't "*preclude* the use of intermediate circuit elements," it doesn't permit the inclusion of every conceivable type of intervening component either. Instead, the construction still requires that the counter pass voltage, current, or control signals to the digital-to-analog converter. (A17137.) Power Integrations' expert was crystal clear that neither Martin nor Wang discloses a counter passing one of these things to the digital-to-analog converter because the memory "completely scrambles on purpose the signals that come through it." (A16906.) It does not matter that the claims permit use of some intervening components (for example, something that merely inverts or scales the counter's input) that do not disrupt the passage of voltage, current, or control signals. A memory isn't such a component. (A16889-90, A16909.) Indeed, this Court recently vacated the PTO's rejection of claim 1 as anticipated by Martin and Wang because the Board's reliance on the fact the claims do not preclude intervening components was a "red herring" and irrelevant to whether the counter passes control signals, voltage, or current to the digital-to-analog converter. *Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1325 (Fed. Cir. 2015).

The jury was thus perfectly free to reject Fairchild's spin on the prior art and accept Power Integrations' testimony that the memory precludes the counter from passing current, voltage, or control signals to the digital-to-analog converter.

## IV.    The Jury's Finding of No Anticipation of the '605 Patent Was Well-Supported, But a New Trial is Necessary on Inducement.

### A.    Substantial Evidence Showed that Maige Does Not Disclose a Current Limit Threshold That Increases During the On Time of the Switch.

The jury's finding that Maige doesn't anticipate the '605 patent was supported by substantial evidence.  Power Integrations' expert showed that Maige was missing the limitation—"a variable current limit threshold that increases during the on time of the switch." (A16894-95, A16907-08, A16913.)  Everyone agreed that Maige had a fixed current limit during normal operation.  (A16894-95, A16907-08, A16913; A16816.)  Moreover, during the start-up period, the current limit did not increase "during the on time of the switch." (*Id.*)  Maige had a high-frequency oscillator that opened and closed the switch 20,000 times a second, while Fairchild pointed to a different, low-frequency oscillator, set at 1 cycle per second, as causing the current limit to increase.  (A16894; A23780 at 3:58-59, 4:36-39.)  As a result, the switch was moving 20,000 times faster, and no evidence suggested that the current limit increased during any particular "on time of the switch." (A16894-95.)  In fact, Power Integrations' expert reproduced the waveforms as described in the Maige reference

and showed that the current limit (dark blue) was constant during the switch's on time (the "high" light blue lines):



(A16894-95.) Fairchild didn't challenge the accuracy of this demonstrative on cross-examination or with its own expert. In fact, Fairchild's expert admitted that he was not aware of a device that could actually detect that Maige's current limit increased during the switch's on time. (A16817.) The jury thus had ample support to conclude that Fairchild's assertion the current limit threshold allegedly increased by a vague, unmeasurable amount wasn't clear and convincing evidence of invalidity.

Fairchild is wrong to accuse (at 50) Power Integrations' expert of "imply[ing] new claim limitations," because he repeatedly showed that was not what he was doing. He expressly agreed the claims are not limited to "normal conditions," and repeatedly

disagreed with Fairchild's efforts to characterize his opinion as relying on a non-existent limitation.  (A16907-08.)  Instead, he explained that Fairchild had failed to show the current limit increased "during the on time of the switch."  (*Id.*)  Contrary to Fairchild's assumption, the switch is "not continually on" during start up but instead is "on and off during startup."  (A16908.)  So it is not enough for Fairchild to argue (at 50) that the current limit increases "during the whole process of start up."  The jury could thus reasonably credit Power Integrations' expert testimony that an increase did not occur "during the on time of the switch."  (A16894-95, A16907-08, A16913.)  The Maige soft start circuit was for an entirely different purpose than the claimed '605 circuit, and Maige could not eliminate the overshoot problem from line voltage variations that was the invention's critical benefit.  (*Id.*)  So it was no surprise that Maige did not disclose the claimed invention, and the PTO presumably reached the same conclusion, because it allowed the claims over materially similar prior art soft start circuits.  (A16894.)

### B.    Cross-Appeal:  A New Trial on Inducement Is Necessary Because of the Erroneous No Direct Infringement Finding.

This Court should order a new trial on whether Fairchild induced infringement of the '605 patent.  The jury's finding of no inducement was infected by its erroneous finding of no direct infringement.  As the district court recognized when granting JMOL of direct infringement, Fairchild conceded that the '605 patent covered its products and that at least "a small amount" had been sold in the U.S.  (A136; A17072;

A16601-03; A16806.)  The only logical explanation for the jury's contrary conclusion was Fairchild's argument that Power Integrations obtained the '605 patent improperly, because the '605 patent is a continuation with arguably broader claims than an earlier patent, the '270 patent, and Fairchild argued during closing that this was "not playing fair, and that's not right."  (A17164, A16832-33.)  These comments were a wholly inaccurate statement of law.  *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988).  And they were irrelevant—their only purpose was to invite the jury to ignore the evidence and engage in nullification.  The district court rightly corrected the result on direct infringement; it should have also ordered a new trial on inducement.  Ample evidence would have supported an inducement finding:  the evidence discussed above at pp. 34-43 for the '851 at '876 patents was equally applicable here, and Fairchild presented no unique arguments against inducement for the '605 patent.  Yet the jury's erroneous finding of no direct infringement short-circuited its ability to consider these issues.

The district court's rationale for denying a new trial was erroneous.  The court instructed the jury during trial that it was not improper to amend or add claims in a continuation, (A16886), and thought that this "curative instruction was sufficient to eliminate any unfair prejudice."  (A137.)  But we know that the instruction was not enough—the jury went astray on direct infringement, and the only explanation, given Fairchild's concession of direct infringement, can be that Fairchild succeeded in convincing it to rule on something other than the evidence.  Moreover, the jury would

have likely found inducement on the '605 patent if it had found direct infringement (as it should have), given that it found inducement on Power Integrations' other patents and the evidence was substantially identical as to all the patents. This Court should thus order a new trial on inducement for the '605 patent where the jury is instructed that direct infringement has been established.

## V.     The District Court's Injunction Decisions Were Within Its Discretion.

### A.     Power Integrations Proved the *eBay* Factors Warranted an Injunction Preventing Further Fairchild Infringement.

#### 1.     The Patented Technologies Drove Demand for the Infringing Products.

The district court correctly found that Fairchild's infringement had irreparably harmed Power Integrations and would continue to do so absent an injunction. Although the patentee must demonstrate "that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement," *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1359-60 (Fed. Cir. 2013), this doesn't require that the patented circuit be the "exclusive" or even "predominant" reason for customer demand. *Apple, Inc. v. Samsung Elecs., Co.*, No. 14-1802, __ F.3d __, slip op. at 12 (Fed. Cir. Sept. 17, 2015) (*Apple IV*). Instead, it is a "flexible analysis, as befits the discretionary nature of the four-factor test for injunctive relief," and there must simply be "some connection" between the patented technology and demand. *Id.* at 10. There are a "variety of ways" to make this showing, including "evidence that a patented feature is one of several features that cause consumers to make their purchasing decisions" and

60

"evidence that the inclusion of a patented feature makes a product significantly more desirable." *Id.* at 11 n.1. Power Integrations presented such evidence here.

The integrated "frequency jitter" or "hopping" technology of the '851 and '876 patents is strongly connected to demand because it reduces electromagnetic interference in a cost-effective manner and enables customers to make smaller, more efficient products. (A16354-56; A213-17 at 1:29-65, 3:9-37, 9:17-35; A232 at 1:22-2:9; A24958.) Power Integrations' CEO testified, without contradiction, that jitter is directly tied to demand for controllers used in power supplies for particular applications. (A16356.) Moreover, Fairchild touts the importance of jitter to customers—its datasheet for the infringing SG6841J stresses that the product has "programmable PWM frequency with hopping," (A24577), specifically identifies the infringing circuit as an added feature for the SG6841, (A24579), and explains the "frequency hopping function helps reduce EMI emission of a power supply." (A24585.) The infringing SG6842J's datasheet is to similar effect, touting that it has "programmable PWM frequency with jittering," which "helps reduce EMI emission of a power supply." (A24642; *see also* A24971, A24983.) Indeed, jitter is important enough that Fairchild incorporates it into the names of some of the accused products—the "j" in SG5841J and SG6842J stands for "jitter." (A16507.) Fairchild has good reason to promote jitter: its Senior Marketing Manager admitted that jitter is "one of the characteristics required by customers," (A16403), and admitted that reducing interference (a key benefit of jitter) is also required by many customers.

61

(A16401.)  A Fairchild Principal Engineer also admitted that an Apple manufacturer told Fairchild that jitter was required for a product it was developing.  (A16501; A25014.)  That customers specifically required jitter is strong evidence of the required connected between demand and the patented technology.  *Apple IV*, slip op. at 13 (vacating denial of injunction where Samsung documents showed that customers rejected non-infringing alternatives).  Indeed, here, as in *Apple*, the defendant had a history of copying the patented technology—this Court noted Fairchild's "corporate culture of copying" the '876 and '851 patents in the prior case, *see* 711 F.3d at 1369, and Fairchild has been caught infringing those patents again here.  Fairchild wouldn't be repeatedly co-opting this technology if it didn't impact demand.

There is a similarly strong nexus between the '605 patent and customer demand.  The '605 patent makes it easier to design power supplies because customers "don't have to worry about the end product receiving too much power," and the circuit is a "much lower cost" solution than prior ones because it is fully integrated into the chip.  (A16371-72; A304-05 at 2:45-50, 3:15-55.)  Power Integrations' Vice President testified that the '605 technology led to "significantly better" product performance, (A16375), and has "certainly" contributed to the products' success.  (A16377.)  Likewise, Fairchild's datasheets advertise the "Constant Output Power Limiting" infringing feature.  (A24566, A24573; A24577, A24586.)  And Fairchild admitted Apple's supplier made this "constant power capability" a requirement, which, as in *Apple IV*, is strong evidence of nexus.  (A16501; A25011-15.)

62

This evidence was all highly probative of customer demand for the patented circuitry. The emphasis on the patented technologies in Fairchild's datasheets for the infringing products is telling, because companies promote features they think will sell products. Moreover, the patented technologies both make the chips cheaper to use (by reducing the number of external components needed for a complete power supply) and the resulting power supply more energy efficient, (A16354-56, A16371-72), both of which Fairchild admits (at 57) are important to customers. Fairchild bizarrely dismisses (at 57) its own advertisements as "puffery," but doesn't explain why its highlighting the patent technologies is not indicative of customer demand. Fairchild is also wrong to portray the infringing features as two among "hundreds"— they appear among only 15 advertised features on the cover page and are both discussed in depth in the text of the datasheets. (A24577; A24585; A24642.) Although Fairchild bemoans the lack of direct "customer evidence," it ignores that its own executives admitted customers have demanded the patented technologies, (A16501), which is the very sort of evidence this Court recently relied upon in *Apple IV*. Finally, the fact that "cost" is also important to customers underscores that Fairchild's strategy of taking the patented technologies and undercutting Power Integrations on price has inflicted the quintessential types of irreparable harm—lost sales and price erosion.

The district court also properly found that Power Integrations would continue to suffer future irreparable harm based in part on the past damage Fairchild's

infringement has inflicted.  "Although injunctions are tools for prospective relief designed to alleviate future harm, by its terms the first *eBay* factor looks, in part, at what has already occurred."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010).  Fairchild is thus wrong (at 55-56) to discount evidence of its past wrongdoing or dismiss it as "dated."  The trial evidence cited above showed that the patented technologies were continuing to drive demand, and Fairchild has offered nothing to suggest that has or will change.  Moreover, this is the second time Fairchild was caught infringing the '876 and '851 patents, so if jitter were really not driving demand, then Fairchild should have just stopped using the patented technology.

Finally, the district court correctly rejected Fairchild's argument (at 58) that other competitors have "superior alternative technologies."  No one beat Power Integrations to market with "primary-side regulation"—Power Integrations introduced such a product in 2002, years before anyone else, including Fairchild. (A16353, A16364.)  Moreover, Power Integrations' sales team was "demoralized" not because others had better technology, as Fairchild implies (at 58), but because System General had taken the patented technology and was slashing prices to levels that Power Integrations could not match without severe lost profits.  (A16471-72.)  This Court should reject Fairchild's attempt to re-litigate these facts on appeal.  And, of course, Fairchild's reference (at 58-59 n.6) to a different case between the parties involving different patents and a different record is irrelevant to whether Chief Judge Stark abused his discretion here.

## 2.    The Other *eBay* Factors Also Justified an Injunction.

The district court also correctly found the remaining *eBay* factors warrant an

injunction.  The court used the same facts supporting irreparable harm—*i.e.,* the

parties' direct competition; Power Integrations' lost sales, price erosion, and

reputational damage; the fact that infringing "design wins" could entrench the

infringing products for years; and Fairchild's touting of the infringing features—to

find damages would be inadequate to compensate future harm.  (A21534-36.)  On

appeal, Fairchild simply repeats its nexus argument (at 59), which fails for the reasons

given in the previous section.

The court was also within its discretion to find the balance of hardships

favored Power Integrations.  (A21536.)  An injunction is appropriate where the bulk

of the patentee's revenue is from the patented products while they are a small subset

of the infringer's revenue.  *i4i*, 598 F.3d at 862-63.  Here, Power Integrations uses the

patented inventions in 95% of its products, while Fairchild sold over 20,000

diversified products in other areas.  (A20643-44; A20653-54.)  It did not matter that

an injunction would force Fairchild to re-design its products to remove the infringing

technologies—"[o]ne who elects to build a business on a product found to infringe

cannot be heard to complain if an injunction against continuing infringement destroys

the business so elected."  *Robert Bosch LLC v. Pylon Corp.*, 659 F.3d 1142, 1156 (Fed.

Cir. 2011).  Fairchild's suggestion that customers would be harmed was pure

speculation that was unsupported by any affidavit from an actual customer.  Finally,

Fairchild's argument (at 59) that being unable to sell to the U.S. would have spillover effects to non-infringing foreign sales contradicts its insistence (when arguing against inducement) that it doesn't care if infringing chips can enter the U.S. Fairchild wants to continue selling chips abroad to be incorporated into U.S.-bound products, and the injunction appropriately prohibited that continued inducement based on the jury's verdict.

An injunction was also in the public interest. "[C]heap copies of patented inventions have the effect of inhibiting innovation and incentive" and "[t]his detrimental effect, coupled with the public's general interest in the judicial protection of property rights in inventive technology," justifies an injunction. *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1346 (Fed. Cir. 2013). The injunction was properly tailored to promote this interest. The patented technologies are tied to customer demand, so the district court properly enjoined all Fairchild products that include them. The injunction leaves Fairchild free to sell chips with the patented circuits removed, so it does not, as Fairchild suggests (at 60), block public access to non-infringing features. That Fairchild still challenges the injunction rather than simply agreeing to remove the patented technology speaks volumes about its value.

### B. The District Court Properly Denied Fairchild an Injunction Given Its Past Licensing and the Rejections in Reexamination.

The district court acted within its discretion in denying Fairchild's injunction motion given two key differences in the parties' positions—(1) Fairchild had freely

licensed and allowed others—including direct competitors—to use the '972 patent,

while Power Integrations refuses to so license its technology, and (2) all asserted

claims of Fairchild's '972 patent had been rejected in *inter partes* reexamination, while

at least one infringed claim of each of Power Integrations patents wasn't subject to

reexamination or any other pending validity challenge.  (A189-90.)  If the Court

reverses on either '972 claim construction, infringement, or obviousness, it need not

reach this issue.  Either way, Fairchild's injunction request was properly denied.

     The district court's decision that Fairchild's prior licensing of the '972 patent

negated irreparable harm was well-supported by precedent.  *See, e.g.*, *ActiveVideo*

*Networks, Inc. v. Verizon Commc'ns, Inc.,* 694 F.3d 1312, 1339-40 (Fed. Cir. 2012).

Fairchild doesn't dispute that it licensed the '972 patent to Infineon, that ██████

███████████████████████████████████████████████████████████

██████ or that Infineon is as equally important a direct competitor as Power

Integrations.  (A21213; A21210; A21268-69.)  Fairchild didn't try to distinguish the

alleged harm that Power Integrations would impose from that Infineon's use of the

'972 patent would inflict.  Moreover, Fairchild's behavior with another direct

competitor, iWatt, that Fairchild says is as important as Power Integrations, was

equally telling.  (A21212-13, A21210.)  Fairchild's internal documents say that it

believes ██████████████████████████████████████████████

██████████████████████████████.  (A21211; A21271.)  Yet, although Fairchild

approached iWatt about the issue, it ultimately "████████████████████████

Confidential Material Subject to a Protective Order Redacted on this Page

████████████████████████.” (*Id.*) The upshot is that Fairchild has allowed

iWatt to infringe the '972 patent without paying anything, and, again, it never tried to

distinguish this harm from anything allegedly inflicted by Power Integrations.

The district court didn't abuse its discretion by rejecting Fairchild's contrary

explanations. For example, the fact the Fairchild/Infineon license involves other

patents does not change the fact that Fairchild has given a direct competitor the

freedom to use the '972 technology. Moreover, Fairchild's suggestion (at 62-63) that

iWatt may not really be infringing contradicts Fairchild's contemporaneous

documents, which say "████████████████████████.”

(A21211; A21271.) Moreover, Fairchild's assertion (at 63) that it is simply "picking

off one infringer at a time," is refuted by its witness's admission that it decided not to

sue. Fairchild has presented no evidence that it is simply biding its time and will sue

iWatt in the future.

The district court was also correct to find that the public interest would be

disserved by an injunction on a patent the PTO has rejected in reexamination.

*Standard Havens Products, Inc. v. Gencor Industries, Inc.*, 996 F.2d 1236 (Fed. Cir. 1993)

(non-precedential) (reversing district court's refusal to stay an injunction pending

appeal where the patent had been rejected in reexamination). The public has a right

to access what is in the public domain, and the '972 is highly likely to be, given the

PTO's rejections. Indeed, the equities have tilted even further against an injunction

Confidential Material Subject to a Protective Order Redacted on this Page

since the district court's decision because the PTO's rejection is now final and on appeal to the Board.

Fairchild's gripe on the public interest is difficult to discern.  It says (at 63) the court should have granted but stayed the injunction rather than denying it outright, yet both would have the same practical effect of preserving the status quo.  Fairchild's admission that a stay would be appropriate negates its assertions of irreparable harm. Fairchild is also incorrect to suggest it lacks any "security" here—if the judgment is affirmed, Fairchild can seek damages for any post-verdict infringement (and, in fact, is pursuing a separate case to do just that), and there is no evidence it would face difficulty collecting any judgment in the unlikely event one becomes final.

## CONCLUSION

For the reasons above, this Court should vacate or reverse the judgment on the '972 patent, order a new trial on inducement for the '605 patent, and otherwise affirm.


Dated:  October 2, 2015                    Respectfully submitted,

                                           */s/ Craig E. Countryman*
                                           Craig E. Countryman
                                           Fish & Richardson P.C.
                                           12390 El Camino Real
                                           San Diego, CA 92130
                                           (858) 678-5070

                                           *Attorneys for Cross-Appellant,*
                                           POWER INTEGRATIONS, INC.

## <u>CERTIFICATE OF SERVICE AND FILING</u>

I certify that I electronically filed the foregoing document using the Court's

CM/ECF filing system on October 2, 2015.  All counsel of record were served via

CM/ECF on October 2, 2015.


*/s/ Craig E. Countryman*
Craig E. Countryman

<u>**CERTIFICATE OF COMPLIANCE**</u>

The undersigned attorney certifies that Power Integrations' Opening Brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B). The relevant portions of the brief, including all footnotes, contain 16,382 words, as determined by Microsoft Word.


Dated:  October 2, 2015

*/s/ Craig E. Countryman*
Craig E. Countryman
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

*Attorneys for Cross-Appellant,*
POWER INTEGRATIONS, INC.